**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AFRICARE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| **XEROX COMPLETE DOCUMENT** | ) | |
| **SOLUTIONS MARYLAND, LLC,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **CIT TECHNOLOGY FIN SERVICE, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

(Jury Trial Requested)

<u>Introduction</u>

This is an action brought by Plaintiff Africare, Inc. ("Africare") for (1) breach of contract and breach of the covenant of good faith and fair dealing against Defendant Xerox Complete Document Solutions Maryland, LLC ("Xerox CDS") seeking damages or an injunction ordering payment in full of all leases, expenses, interest, and fees as described below, and (2) declaratory judgment against Defendants CDS and CIT Technology Fin Service, Inc. ("CIT") stating that Africare does not owe either entity any money or payment of any kind. Africare seeks a jury trial in this action.

Additionally, Africare is also a defendant and cross-plaintiff against De Lage Landen Financial Services, Inc. ("De Lage") in a recently filed lawsuit removed from a Pennsylvania state court to the U.S. District Court for the Eastern District of Pennsylvania seeking damages and cross-damages. *De Lage Landen Financial Services, Inc. v. Africare, Inc.*, (E.D.PA Civil

Action No. 2:17-cv-01279-CJ).   Within the next day or two, Afriare will file a motion in the

EDPA Court to transfer that EDPA case to the District of Columbia because the EDPA Court

may not have jurisdiction over the above-captioned defendants in this case; judicial efficiency

and the full and fair resolution of this case would be best advanced by trying this case in one

court, with all interested parties present;; all or nearly all of the events at issue took place in the

District of Columbia; and the witnesses and documentary evidence are overwhelmingly located

in the District of Columbia or metropolitan area.   Africare anticipates amending this Complaint

after the EDPA court transfers that case to the District of Columbia.

<u>Parties</u>

1.      Plaintiff Africare  is a nonprofit, 501(c)(3) corporation organized under the laws of the

District of Columbia with its headquarters in the District of Columbia.

2.      Upon information and belief, Defendant Xerox CDS is a for-profit Maryland Limited

Liability Company whose headquarters is located in Frederick, MD.   Further upon

information and belief, Xerox CDS has an office and/or showroom located at 1301 K

Street, N.W., Washington, D.C. 20036 from which it conducts business in the District of

Columbia.   Further upon information and belief, Xerox CDS is legally affiliated with

Xerox Corporation ("Xerox"), a New York corporation with a business address in

Norwalk, Connecticut.   Further upon information and belief, Xerox CDS acts as Xerox's

sales agent in the greater Washington, D.C. metropolitan area for printer-copiers and

other office equipment.   Further upon information and belief, Xerox CDS's registered

agent in the District of Columbia is: Business Filings Incorporated, 1015 15th Street, NW,

# 1000, Washington, D.C. 20005.

3.    Upon information and belief, Defendant CIT is a for-profit company whose headquarters is located at 21146 Network Place, Chicago, IL 60673-1211 and whose business, among other things, is to lease office equipment, including Toshiba printer-copiers.  (Xerox CDS and CIT together, the "Defendants").   Further upon information and belief, CIT's registered agent is: C T Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, IL, 60604.

4.    While not yet a defendant in this case, upon information and belief, De Lage is a for-profit Pennsylvania company with its headquarters in Pennsylvania, whose business, among other things, is to lease office equipment, including Xerox CDS printer-copiers.

Jurisdiction and Venue

5.    This Court has diversity jurisdiction over this case pursuant to 28 U.S. Code § 1332.  It further has personal jurisdiction over the Defendants (and will have personal jurisdiction over De Lage) because the allegations and claims for relief herein arise from Defendants' (and De Lage's) transaction of business in the District of Columbia.

6.    Venue is proper in the District of Columbia because all or nearly all of the events at issue took place in the District of Columbia; the witnesses and documentary evidence are overwhelmingly located in the District of Columbia; Xerox CDS has an office in the District of Columbia and its headquarters in nearby Maryland; and CIT and De Lage regularly conduct business in the District of Columbia.

Factual Background

7.    The significant majority of Africare's contractual negotiations with Xerox CDS were conducted by its former Chief of Staff, Marketing and Development Officer, Kendra Davenport ("Davenport"), who is no longer employed by Africare.   Africare has

conducted a good-faith investigation of the facts related to this lawsuit and the purported contracts at issue, but anticipates amending its Complaint after discovery takes place or as more facts otherwise become available.  Accordingly, many of Africare's allegations set forth herein are upon information and belief.

8.     Africare is one of the largest African-American led non-profit international development organizations, and is a leader in development assistance to Africa.  It has programs throughout the continent and is highly respected, but has faced financial difficulties in recent years because of a decline in revenue and federal grants.

9.     Upon information and belief, Xerox CDS acts as a regional sales agent or representative for Xerox office equipment, including the seven printer-copiers that Africare eventually acquired.

10.     Upon information and belief, CIT is a for-profit Illinois company that regularly conducts business in the District of Columbia.  As described below, CIT acted as the leasing company for Toshiba printer-copiers that Africare had been using prior to acquiring the Xerox printer-copiers.

11.     Upon information and belief, De Lage is a for-profit Pennsylvania company that regularly conducts business in the District of Columbia, whether directly or through Xerox CDS, which regularly acts as an actual or *de facto* broker, partner, agent, and/or joint venturer of De Lage.  Upon information and belief, De Lage's business includes offering lease financing for office equipment distributed, sold, and/or leased by Xerox CDS to customers in the District of Columbia and elsewhere.

12.     Upon information and belief, Davenport and others at Africare dealt only with Xerox CDS, and never communicated with De Lage directly throughout the events at issue in

this lawsuit.   Upon information and belief, Xerox CDS sent Davenport all of the documents described below to execute.

2013 Letter Agreement; 2013 CDS Agreement (or in the alternative, 2013 Maintenance Agreement); and 2013 Lease Agreement

13.     Upon information and belief, prior to 2013 and afterward, Africare had a lease agreement with CIT to lease several Toshiba printer-copiers.  Pursuant to that CIT lease, Africare paid CIT monthly payments.

14.     Upon information and belief, in the first half of 2013, Xerox CDS contacted Africare in an effort to sell or lease new Xerox office equipment to Africare.  During this period, Xerox CDS learned that Africare was in desperate financial condition and that Africare did not possess sophisticated financial acumen or technical expertise regarding office equipment.

15.     Upon information and belief, also during this period, Xerox CDS purported to conduct an "analysis" of Africare's printing and copying needs and costs.  Xerox CDS represented to Africare in its analysis that Africare would save more than $1,000 per month if it adopted Xerox CDS's proposed "solution," meaning if Africare ended its lease with CIT and leased Xerox printer-copiers instead.   In addition, upon information and belief, Xerox CDS represented to Africare that in the professional, expert judgment of Xerox CDS, the number and type of printer-copiers that Xerox CDS proposed to Africare were appropriate for Africare's size, needs, and finances and were an improvement over its existing CIT lease for Toshiba printer-copiers.

16.     Further, upon information and belief, Xerox CDS represented and warranted to Africare that (1) Xerox CDS would make a charitable contribution to Africare in the amount of $10,000, (2) Africare's use of the Xerox printer-copiers would lower Africare's costs and

save Africare money, and (3) the new Xerox printer-copiers suggested by Xerox CDS were appropriate and suitable for Africare's needs, size, and financial condition.

17.     Upon information and belief, many of Xerox CDS's representations and warrants to Africare were set forth in a series of emails between Xerox CDS and Davenport and possibly in telephone communications between them as well.

18.     Africare reasonably relied on all of Xerox CDS's representations and warrants, made in emails and orally, as well as on Xerox CDS's expertise, when Africare agreed to lease the Xerox printer-copiers.   This agreement between Africare and Xerox CDS was an enforceable contract memorialized in emails ("2013 CDS Agreement").

19.     Africare also reasonably relied on all of Xerox CDS's representations and warrants when, on or about April 30, 2013, Davenport executed a separate Maintenance Agreement ("2013 Maintenance Agreement") with Xerox CDS.   Under the 2013 Maintenance Agreement, among other things Africare contracted with Xerox CDS to service and supply the Xerox printer-copiers leased in 2013 for a period of five years.

20.     In the alternative, the representations and warrants by Xerox CDS to Africare and, based on these representations and warrants, Africare's agreement to end its CIT lease for two Toshiba printer-copiers, to surrender those printer-copiers to Xerox CDS, and to lease the Xerox printer-copiers, were material parts of the 2013 Maintenance Agreement.

21.     The 2013 Maintenance Agreement was a contract of adhesion, and Xerox CDS never explained its terms or meaningfully disclosed what rights Africare was purportedly waiving or the full extent of Africare's obligations and liabilities under the 2013 Maintenance Agreement.   Nor did Xerox CDS explain that Africare could negotiate the terms of the 2013 Maintenance Agreement, beyond the representations and warrants

made by Xerox CDS to Africare and Africare's agreement to surrender the Toshibas to Xerox CDS and lease the Xerox printer-copiers based on those representations and warrants.

22. Upon information and belief, on or about July 8, 2013, Xerox CDS sent a Letter Agreement ("2013 Letter Agreement") executed by Michael J. Gross among other things "confirm[ing]" that Xerox CDS would "be sending you [Africare] a check in the amount of $10,000 as a donation . . . ." Upon information and belief, on or about that time Africare's Corporation & Foundations Officer Katelyn Brewer executed the 2013 Letter Agreement with Xerox CDS. Further upon information and belief, Africare did eventually receive a check from Xerox CDS in the amount of $10,000 and treated it as a charitable donation.

23. Upon information and belief, Africare did not have any direct dealings with De Lage. Instead, Xerox CDS sent Africare a form lease from De Lage for Africare to execute and send back to Xerox CDS, which Africare did ("2013 Lease Agreement").

24. Upon information and belief, at no time did De Lage return to Africare (either directly or through Xerox CDS) a copy of the 2013 Lease Agreement executed by De Lage. Upon information and belief, the 2013 Lease Agreement did not "commence" unless and until De Lage executed the lease and the lease did not commence because De Lage did not provide a signed lease to Africare. As a result, there was no binding 2013 Lease Agreement and both Africare and De Lage were free to discontinue the leasing of the printer-copiers at any time.

25. Upon information and belief, neither Xerox CDS nor De Lage ever explained the terms of the 2013 Lease Agreement, gave Africare an opportunity to negotiate the terms, or

gave Africare an opportunity to seek alternative financing.  Rather, Xerox CDS required Africare to use De Lage exclusively to finance the printer-copiers and did not provide Africare with other leasing options.

26.    Upon information and belief, each of Xerox CDS's representations and warrants to Africare in both the 2013 CDS Agreement (or in the alternative the 2013 Maintenance Agreement) and in the 2013 Letter Agreement was false and Xerox CDS knew each was false.    Upon information and belief, Xerox CDS knowingly took advantage of its knowledge of Africare's desperate financial condition and lack of financial acumen and office equipment know-how to fraudulently induce Africare to enter into these two agreements, which did not provide the benefits to Africare that Xerox CDS represented and warranted that they would.

27.    Further upon information and belief, the so-called $10,000 charitable contribution was factored into the cost of Africare's leasing the Xerox printer-copiers but Xerox CDS did not disclose to Africare that it was.  As a result, upon information and belief, from a financial perspective, Xerox CDS was actually providing a high-interest loan of $10,000 to Africare that Africare financed through the 2013 Lease Agreement.  Africare does not know whether or not Xerox CDS deducted this purported charitable contribution on its tax returns.

28.    Furthermore, upon information and belief, the 2013 CDS Agreement (or in the alternative the 2013 Maintenance Agreement) did not save Africare money; the number, type, and cost of the Xerox CDS printer-copiers are inappropriate for Africare's needs and financial condition; and the number, type, and cost of the new Xerox printer-copiers were not an improvement over the previous Toshiba printer-copiers under the CIT lease.   Further

upon information and belief, there were and are better type, cost, and financing options in the marketplace than those offered by Xerox CDS and De Lage to Africare.

29.     Upon information and belief, during the spring of 2013, De Lage acted as a finance arm of Xerox CDS for office equipment.  Upon information and belief, De Lage enjoyed a *de facto* brokerage, partnership, principal-agent, and/or joint venture relationship with Xerox CDS and was very familiar with Xerox CDS's sales tactics, false representations, and practice of preying on financially inexperienced customers.  Further upon information and belief, Xerox CDS and De Lage have entered into an agreement regarding at least a portion of their commercial relationship, but perhaps not including De Lage's *de facto* brokerage, partnership, principal-agent, and/or joint venture relationship with Xerox CDS.

30.     Furthermore, for the reasons stated above as they relate to the 2013 CDS Agreement (or in the alternative the 2013 Maintenance Agreement), Xerox CDS breached the representations and warrants on which Africare reasonably relied when agreeing to enter into the 2013 Lease Agreement.

2015 Letter Agreement; 2015 CDS Agreement (or in the alternative, 2015 Maintenance
Agreement); and 2015 Lease Agreement

31.     Upon information and belief, Xerox CDS again approached Africare in early 2015 about providing more Xerox printer-copiers to Africare in place of its remaining Toshiba machines.  On or about March 2015, Xerox CDS Senior Vice President Michael J. Gross ("Gross") sent a Letter Agreement to Africare ("2015 Letter Agreement").  In that 2015 Letter Agreement, Xerox CDS represented and warranted that it would (1) send a check to Africare for $100,000 to "cover the remaining lease payments and ship back costs" of Africare's Toshiba machines to CIT and (2) that "[t]his includes a $10,000 contribution

to be used where you [Africare] need it most."   This 2015 Letter Agreement was executed by Gross on behalf of Xerox CDS.  Davenport in turn executed it on behalf of Africare on or about March 19, 2015.  Also on or about March 19, 2015, Davenport executed a Maintenance Agreement with Xerox CDS ("2015 Maintenance Agreement").

32.    Upon information and belief, also during the beginning of 2015, Xerox CDS further represented and warranted to Africare that (3) the new Xerox CDS contract for additional Xerox printer-copiers would save Africare money over the remaining Toshiba printer-copiers and (4) the new Xerox printer-copiers suggested by Xerox CDS were appropriate and suitable for Africare's needs, size, and financial condition.  Upon information and belief, Xerox CDS's representations and warrants to Africare were set forth in a series of emails between Xerox CDS and Davenport and possibly in telephone communications between them as well.

33.    In addition, in the 2015 Letter Agreement, Xerox CDS further represented and warranted that the new copiers would make Africare "more productive" and that Africare and Xerox CDS were engaged in a "continued partnership."

34.    Based upon Xerox CDS's representations and warrants, Africare entered into a second agreement with Xerox CDS pursuant to which Xerox CDS also took the five Toshiba printer-copiers from Africare's office and replaced them with five Xerox printer-copiers in addition to the two Xerox printer-copiers from the 2013 deal ("2015 CDS Agreement").

35.    In the alternative, the representations and warrants by Xerox CDS to Africare and, based on these representations and warrants, Africare's agreement to end its CIT lease for the remaining Toshiba printer-copiers, to surrender those printer-copiers to Xerox CDS, and

to lease the Xerox printer-copiers were material parts of the 2015 Maintenance Agreement. The 2015 Maintenance Agreement provided in part that Xerox CDS would supply and service the Xerox printer-copiers leased by Africare in 2015.

36.     The 2015 Maintenance Agreement was a contract of adhesion, and Xerox CDS never explained its terms or meaningfully disclosed what rights Africare was purportedly waiving or the full extent of Africare's obligations and liabilities under the 2015 Maintenance Agreement. Nor did Xerox CDS explain that Africare could negotiate the terms of the 2015 Maintenance Agreement, beyond the representations and warrants made by Xerox CDS to Africare and Africare's agreement to surrender its remaining Toshibas and lease Xerox printer-copiers based on those representations and warrants.

37.     Africare again reasonably relied on Xerox CDS's representations and warrants as well as on Xerox CDS's expertise when Africare agreed to enter into the 2015 Letter Agreement, 2015 CDS Agreement for additional Xerox printer-copiers, and the 2015 Maintenance Agreement.

38.     Upon information and belief, Africare again did not have any direct dealings with De Lage. Instead, Xerox CDS again sent Africare a form lease from De Lage for Africare to execute and send back to Xerox CDS, which Africare did ("2015 Lease Agreement").

39.     Upon information and belief, at no time did De Lage return (either directly or through Xerox CDS) a 2015 Lease Agreement executed by De Lage. Upon information and belief, the 2015 Lease Agreement did not "commence" unless and until De Lage executed the lease and the lease did not commence because De Lage did not provide a signed lease to Africare. As a result, there was no binding 2015 Lease Agreement and

both Africare and De Lage were free to discontinue the leasing of the Xerox printer-copiers at any time.

40.     Upon information and belief, the terms of the 2015 Lease Agreement were substantially different from those of the 2013 Lease Agreement, although both are quite difficult to read.   Further upon information and belief, once again Xerox CDS did not provide alternative leasing options nor did it permit Africare to explore other leasing companies or financing options through a bank or otherwise.   Upon information and belief, neither Xerox CDS nor De Lage ever explained the terms of the 2015 Lease Agreement or gave Africare an opportunity to negotiate the terms or to ask questions.   Upon information and belief, once again the terms, conditions, and interest rates in the 2015 Lease Agreement were inferior to those available in the market for comparable equipment financing.

41.     Once again, Xerox CDS breached the representations and warrants on which Africare reasonably relied when it agreed to enter into the 2015 CDS Agreement (or in the alternative the 2015 Maintenance Agreement) and 2015 Letter Agreement.   Similarly, once again Xerox CDS breached the representations and warrants on which Africare reasonably relied when it agreed to enter into the 2015 Lease Agreement.

42.     Upon information and belief, Africare remains legally liable for the CIT lease payments and Xerox CDS did not pay them off as it represented and warranted.

43.     For example, on or about July 2015, contrary to its previous representations and agreement with Africare, including but not limited to the 2015 Letter Agreement, Xerox CDS sent Africare a letter stating that it would not in fact pay Africare $100,000 to pay off the existing CIT lease for the five Toshiba printer-copiers that Africare had previously been using.   Instead, without seeking permission or approval from Africare, Xerox CDS

unilaterally announced that it would pay Africare's monthly payments to CIT under the lease for the Toshiba printers.

44.     But even after breaching its 2015 Letter Agreement with Africare by unilaterally announcing that it would not in fact pay Africare $100,000 to pay off the CIT lease and ship back the Toshiba printer-copiers, Xerox CDS breached its own, new representation and warrants that it would pay Africare's monthly payments under the CIT lease.  Upon information and belief, Xerox CDS has not paid all of the CIT lease payments on behalf of Africare, and CIT has sent Africare past due invoices demanding payment for Toshiba printer-copiers that Xerox CDS or De Lage removed from Africare's office.

45.     Upon information and belief, each of Xerox CDS's representations and warrants to Africare was false and Xerox CDS knew that each was false.  Upon information and belief, Xerox CDS knowingly took advantage of its knowledge of Africare's desperate financial condition and lack of financial acumen and office equipment know-how to fraudulently induce Africare to enter into the 2015 Letter Agreement and the 2015 CDS Agreement (or in the alternative the 2015 Maintenance Agreement), neither of which provided the benefits to Africare that Xerox CDS represented and warranted.

46.     Further upon information and belief, the alleged $10,000 charitable contribution in the 2015 Letter Agreement was factored into the cost of Africare's leasing the Xerox printer-copiers, but Xerox CDS did not disclose to Africare that it was.  As a result, upon information and belief, from a financial perspective, Xerox CDS was actually providing a high-interest loan of $10,000 to Africare that Africare financed through the 2015 Lease Agreement.

47. Further upon information and belief, Xerox CDS did not pay in full "the remaining lease payments" for the Toshiba copiers to CIT; nor did Xerox CDS pay the "ship back costs" to return the Toshiba printer-copiers to CIT.  To the contrary, upon information and belief, Xerox CDS kept the Toshiba copiers in storage instead.

48. Furthermore, upon information and belief, the new Xerox CDS printer-copiers did not save Africare money; the number, type, and cost of the Xerox printer-copiers are inappropriate for Africare's needs and financial condition; and the number, type, and cost of the new Xerox printer-copiers were not an improvement over the previous Toshiba printer-copiers under the CIT lease.  Further upon information and belief, there were and are better type, cost, and financing options in the marketplace than that offered by Xerox CDS and De Lage.

### 2013 and 2015 De Lage Lease Agreements

49. Upon information and belief, both the 2013 and 2015 Lease Agreements were contracts of adhesion, hard to read, single-spaced, contained small font, and with legal terms that a non-lawyer would not understand.

50. Upon information and belief, throughout this period, Xerox CDS acted as De Lage's broker, partner, agent, and/or joint venturer.  Xerox CDS knew that Africare lacked the legal and financial sophistication to understand the 2013 and 2015 Lease Agreements' terms and financing, but neither Xerox CDS nor De Lage explained the terms of either the 2013 or 2015 Lease Agreements to Africare.  Nor did Xerox CDS or De Lage indicate that any of the terms might be negotiable.

51. Upon information and belief, although the 2013 and 2015 Lease Agreements are quite difficult to read, they appear to be substantially different from each other.  For example,

the 2013 Lease Agreement is one page long and appears to have ten paragraphs, while the 2015 Lease Agreement is two pages long and appears to have twenty-three paragraphs. Upon information and belief, neither Xerox CDS nor De Lage ever explained to Africare the differences between the respective Leases, what the changes and additions were, and what the significance of the new additions and changes were with respect to Africare's rights and obligations.

52.     Upon information and belief, the material terms that Xerox CDS and De Lage did not explain or meaningfully disclose to Africare regarding the 2013 Lease Agreement include, but are not limited to: indemnification provisions; what constitutes an event of default; the remedies that De Lage claims to have in the event of a default; the supposed waiver of all rights and remedies under the Uniform Commercial Code; choice of law and forum; a failure to disclose the price that De Lage would demand for Africare to purchase the copiers at the end of the Lease, and instead offering a purchase price at an unspecified "Fair Market Value" that De Lage retained exclusive authority to determine five years later and without any objective bases; and an adjustment of the Lease payment by as much as fifteen percent if Xerox CDS's estimate (not Africare's estimate) for the cost of the printer-copiers and taxes turned out to be incorrect.

53.     Upon information and belief, the material terms that Xerox CDS and De Lage did not explain or meaningfully disclose to Africare regarding the 2015 Lease Agreement include, but are not limited to: lease "adjustments" up to 15% if Xerox CDS's estimate (not Africare's estimate) of the cost of the printer-copiers or taxes was inaccurate; 10% annual payment increases; the operation, degree, and trigger for penalties; the meanings of multiple references to the Uniform Commercial Code; waiver of all of Africare's

rights and remedies under the Uniform Commercial Code; Africare's inability to transfer or assign the Leases; a failure to disclose the price that De Lage would demand for Africare to purchase the copiers at the end of the Lease, and instead offering a purchase price at an unspecified "Fair Market Value" that De Lage retained exclusive authority to determine five years later and without any objective bases; De Lage's ability to transfer or assign the Leases without Africare's permission or approval; the terms of default; the operation of the default remedies; processing fees; and other terms that would increase Africare's costs and liabilities.  Nor, upon information and belief, did the 2013 or 2015 Lease Agreements permit Africare to rescind the Leases for a period of time without penalty.

54.  Further upon information and belief, neither Xerox CDS nor De Lage disclosed to Africare the nature and extent of their business relationship, including but not limited to the financial interests and benefits that they received; the benefits they received from forcing Africare to lease from De Lage rather than obtain other financing for the Xerox printer-copiers; and the higher costs that Africare incurred from leasing to De Lage.  But for these material omissions of fact, Africare would not have entered into the 2013 and 2015 Lease Agreements.

55.  Upon information and belief, De Lage was very familiar with Xerox CDS's sales tactics, false representations, and practice of preying on financially inexperienced customers. Upon information and belief, Xerox CDS and De Lage never disclosed to Africare Xerox CDS's brokerage / partnership / agency / joint venture relationship with De Lage.  Nor did they disclose any fees, payments, or other contractual arrangements that may exist between Xerox CDS and De Lage.  Finally, Xerox CDS and De Lage did not afford

Africare an opportunity to seek legal advice about the Leases nor to find an alternative leasing option.

56.     Upon information and belief, De Lage benefitted from Xerox CDS's practices in a number of ways for both the 2013 and 2015 Lease Agreements.  First, De Lage knew that many of Xerox CDS's customers were financially inexperienced and that Xerox CDS could induce them to accept De Lage's onerous finance terms, rates, and conditions that it would not be able to obtain from commercially savvy customers.   Second, upon information and belief, De Lage knew or had reason to suspect that Xerox CDS as part of its sales tactics misled customers such as Africare by making representations and warrants that were false, misleading, or incomplete; by failing to disclose material information about financing terms that it knew Africare (and other customers) would not understand; and by making promises that Xerox CDS would not keep.  Third, upon information and belief, De Lage knowingly facilitated Xerox CDS's bogus $10,000 charitable contributions and $100,000 charitable payment on behalf of Africare by charging interest, fees, and/or other charges that in reality allowed Xerox CDS's purported contribution to be financed by Africare through its 2013 and 2015 Lease Agreement payments.

57.     Africare reasonably relied on Xerox CDS's false representations and warrants set forth above when Africare entered into both the 2013 and 2015 Lease Agreements with De Lage.

58.     Upon information and belief, Xerox CDS mandated that Africare use De Lage to lease the equipment in both 2013 and 2015.  Upon information and belief, Xerox CDS did not provide alternative leasing options nor did it permit Africare to explore other leasing

companies or financing options through a bank or otherwise. Upon information and belief, the terms, conditions, and interest rates in the 2013 and 2015 Lease Agreements were inferior to those available in the market for comparable equipment financing. Finally, upon information and belief, De Lage knew or had reason to know all of these things, never disclosed them to Africare, and directly benefitted from these false representations and material omissions.

### Count I – Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing: (A) 2013 and 2015 Letter Agreements and (B) 2013 and 2015 CDS Agreements (or in the alternative, 2013 and 2015 Maintenance Agreements)

59.   Africare incorporates by reference each and every preceding paragraph as if set forth fully herein.

60.   Xerox CDS breached the 2013 and 2015 CDS Agreements (or in the alternative, the 2013 and 2015 Maintenance Agreements) and the 2013 and 2015 Letter Agreements by not providing the full and expected benefit of the bargains to Africare.

61.   Specifically, Africare did not receive the benefit of the bargain of the 2013 CDS Agreement (or in the alternative, the 2013 Maintenance Agreement) and the 2013 Letter Agreement because Africare entered into those agreements based upon Xerox CDS's representations and warrants that it would (1) make an actual charitable contribution of $10,000, not one that in reality was financed by Africare by means of above-market financing terms; (2) save Africare money and improve productivity; and (3) provide new printer-copiers that were appropriate in number, type, and capabilities for Africare's needs, size, and financial condition. None of these representations and warrants was true, Xerox CDS knew that they were not true, and Africare did not receive the benefit of the

bargains that were based on these representations and warrants because they were not true.

62.     Similarly, Africare did not receive the benefit of the bargain of the 2015 CDS Agreement (or in the alternative, the 2015 Maintenance Agreements) and the 2015 Letter Agreement because Africare entered into those agreements based upon Xerox CDS's representations and warrants that Xerox CDS would (1) pay off the CIT Lease all at once and in its entirety and relieve Africare of its entire financial obligation to pay CIT as well as ship back all of the Toshiba printers to CIT; (2) make an actual charitable contribution of $10,000, not one that in reality was financed by Africare by means of above-market financing terms; (3) save Africare money and improve its productivity; and (4) provide new printer-copiers that were appropriate in number, type, and capabilities for Africare's needs, size, and financial condition.  None of these representations and warrants was true, Xerox CDS knew that they were not true, and Africare did not receive the benefit of the bargains that were based on these representations and warrants because they were not true.

63.     Xerox CDS also breached the implied covenant of good faith and fair dealing of the 2013 and 2015 Letter Agreements and 2013 and 2015 CDS Agreements (or in the alternative, the 2013 and 2015 Maintenance Agreements), as well as the 2013 and 2015 Lease Agreements, by: failing to disclose its business brokerage / agency / partnership / joint venture / contractual relationship with De Lage; failing to disclose that Africare was actually financing Xerox CDS's bogus $10,000 charitable contributions to Africare in 2013 and 2015 as well as the $100,000 payment(s) on Africare's behalf; taking advantage of Africare's lack of financial and legal sophistication by including and failing to disclose

meaningfully the onerous terms in the 2013 and 2015 Lease Agreements and by charging above-market financial terms when there were better terms available in the marketplace; making false representations to Africare and by not correcting them; inducing Africare to enter into the 2013 and 2015 CDS Agreements (or in the alternative, the 2013 and 2015 Maintenance Agreements) for printer-copiers that were not suitable for Africare's needs or finances; making false representations that Africare would save money and improve productivity with the new printer-copiers under the 2013 and 2015 CDS Agreements (or in the alternative, the 2013 and 2015 Maintenance Agreements) when in fact Africare did not save money under these agreements nor did they improve its productivity; fraudulently inducing Africare to enter into the 2013 and 2015 CDS Agreements (or in the alternative, the 2013 and 2015 Maintenance Agreements), 2013 and 2015 Letter Agreements, and 2013 and 2015 Lease Agreements when Xerox CDS's material representations were false and Xerox CDS knew or had reason to know that they were false; and exposing Africare to ongoing liability to CIT under the previous leases for Toshiba printer-copiers by not paying off the CIT leases in full and by not shipping back the Toshiba printer-copiers to CIT.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff Africare respectfully requests that the Court enter an Order:

A.   Granting judgment against Xerox CDS in an amount equal to Africare's damages resulting from Xerox CDS's breach of the 2013 and 2015 Letter Agreements and the 2013 and 2015 CDS Agreements (or in the alternative, the 2013 and 2015 Maintenance Agreements), including but not limited to

(1) losses from Xerox CDS's failure to make two actual $10,000 charitable contributions to Africare that were not paid for or financed indirectly by Africare by means of onerous lease terms in the 2013 and 2015 De Lage leases in an amount to be determined at trial;

(2) losses resulting from Xerox CDS's failure to deliver promised savings compared to Africare's previous lease agreement for Toshiba printer-copiers;

(3) losses resulting from Xerox CDS's failure to deliver printer-copiers of the appropriate number, type, and capabilities for Africare's needs, size, and financial condition;

(4) any liability enforceable against Africare under the 2013 and 2015 Lease Agreements it entered into with De Lage in consideration of and in reliance on the material representations and warrants made by Xerox CDS in the 2013 and 2015 Letter Agreements, the 2013 and 2015 CDS Agreements, and/or the 2013 and 2015 Maintenance Agreements, in an amount to be determined at trial but estimated to be at a minimum approximately $289,802.96; and

(5) any liability enforceable against Africare created by Xerox CDS's failure to pay  the remaining cost of Africare's obligations under its lease agreement or agreements with CIT and to ship back the Toshiba printers to CIT, in an amount to be determined at trial but estimated to be at a minimum approximately $38,291.00.

B.    Declaring that (1) Africare does not owe Xerox CDS any money for any purpose or for any reason whatsoever, including but not limited to any fees, charges, interest, or any other kind of payment demand stemming from or arising under the respective 2013 and 2015 CDS Agreements and/or the 2013 and 2015 Maintenance Agreements, the 2013 and

2015 Letter Agreements, and/or any other agreement whether oral or in writing; for alleged storage of Toshiba printers; or otherwise; (2) Xerox CDS has assumed any and all obligations that Africare owes to CIT under Africare's agreement or agreements to lease Toshiba printer-copiers from CIT by assuming possession of the Toshiba printer-copiers and by entering into the 2013 and 2015 Letter Agreements and the 2013 and 2015 CDS Agreements (or in the alternative, the 2013 and 2015 Maintenance Agreements); (3) Xerox CDS's breaches of the 2013 and 2015 Letter Agreements, the 2013 and 2015 CDS Agreements, and/or the 2013 and 2015 Maintenance Agreements were material failures of performance that relieved Africare of its obligations to perform under these agreements, including Africare's obligation to lease Xerox printer-copiers, and (4) Africare is therefore not liable for any failure to perform under the 2013 and 2015 Lease Agreements following the date of Xerox CDS's material breaches.

C.      Declaring that Africare has fully performed under the terms of its lease agreement with CIT, and does not owe CIT any money for the lease of Toshiba printer-copiers that have not been in Africare's possession, nor in use by Africare, for many months or years.

D.      Such other relief as this Court deems just and equitable.

Respectfully submitted,

_____/s_____
August 22, 2017                                 Peter C. Choharis
                                                DC Bar No. 444787
                                                The Choharis Law Group, PLLC
                                                1300 19th Street, NW
                                                Suite 620
                                                Washington, DC 20036
                                                (202) 587-4478
                                                choharis@choharisglobalsolutions.com