## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFRICARE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **Case No. 17-cv-1712 (RMC)** |
| | ) |
| XEROX COMPLETE DOCUMENT SOLUTIONS MARYLAND, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |

| | |
|---|---|
| DE LAGE LANDEN FINANCIAL SERVICES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **Case No. 17-cv-1945 (RMC)** |
| | ) |
| AFRICARE, INC., | ) |
| | ) |
| Defendant. | ) |

## OPINION

Africare, Inc. (Africare) complains that Complete Document Solutions Maryland, LLC (CDS) used high-pressure tactics and unfulfilled promises to induce Africare into leasing seven Xerox Corporation printer-copiers it did not need and could not afford. CDS supplied ink, toner, and other maintenance services and arranged financing through De Lage Landen Financial Services, Inc. (DLL), from whom Africare then leased the copiers. This sequence was followed in 2013 for two printer-copiers and in 2015 for an additional five printer-copiers. The 2015 agreement was intended to replace five printer-copiers manufactured by the Toshiba Corporation (Toshiba) that Africare had leased from CIT Technology Financing Services, Inc. (CIT).

1

Africare alleges that CDS agreed to pay all lease charges Africare owed to CIT in exchange for the 2015 lease and maintenance agreements for the five Xerox printer-copiers.

In the meantime, the federal government decreased its grants to Africare and the non-profit decreased its work force by one third in 2015. When it could not negotiate lesser costs with DLL and CDS, Africare stopped making payments—to DLL in late 2016 and to CDS in mid-2017. CDS then stopped its payments to CIT on the remainder of Africare's lease of the Toshiba printer-copiers.

What followed was a barrage of litigation: DLL sued Africare in Pennsylvania state court and Africare sued CDS and CIT in this Court. All parties counterclaimed. The DLL matter was first removed to Pennsylvania federal court and then transferred to this Court for the convenience of the parties. The separate cases between (1) Africare and DLL and (2) Africare, CDS and CIT were consolidated through discovery and summary judgment.

Before the Court are motions for summary judgment against Africare filed by CDS, CIT, and DLL.

# I.  BACKGROUND

## A.  The Parties

Africare is a District of Columbia-based nonprofit that provides development assistance to individuals and groups in Africa.[1]  Africare provides managerial, technical, and strategic support to programs throughout the continent.[2, 3]

CIT is a New Jersey-based company whose business includes the leasing of office equipment.

CDS is a Maryland-based company that acts as a regional sales agent for Xerox Corporation (Xerox) in the greater Washington, D.C. metropolitan area.[4]

DLL is a Pennsylvania-based financial services corporation whose business includes the leasing of office equipment through dealers such as CDS.

## B.  The 2013 Agreements Between Africare, Nauticon, and CIT

On March 5, 2013, Africare signed a lease with Nauticon Imaging Systems for five Toshiba copiers.[5]  Nauticon delivered the copiers and then assigned all rights to the equipment to CIT (hereafter, the CIT Lease).  The CIT Lease required Africare to make 60 monthly lease payments of $3,481, totaling $208,860 (equal to $696.20/month or $41,772/60

---

[1] The facts are not in dispute unless otherwise indicated.

[2] Africare submitted the same memorandum opposing CDS's, CIT's, and DLL's motions for summary judgment.  Unless otherwise noted, the Court cites to Africare's Opposition in Case No. 17-cv-1712.  *See* Africare's Mot. in Opp'n to CDS and CIT's Mots. for Summ. J. (Opp'n) [Dkt. 40].

[3] When citing to exhibits, the Court cites to the electronic case filing (ECF) header page number, not the original page number of the filed document.

[4] Africare filed suit against "Xerox Complete Document Solutions Maryland, LLC" but CDS notes that its correct name is "Complete Document Solutions, Maryland, LLC."  *See* CDS Answer and Countercl., Case No. 17-cv-1712 [Dkt. 11].

[5] For ease of reading, the Court shortens "printer-copiers" to "copiers" throughout.

months (5 years) to lease each Toshiba copier).  *See* Ex. A-1, CIT's Mot. for Summ. J. (CIT

Mot.), CIT Lease, Case No. 17-cv-1712 [Dkt. 39-4].

### C.  The 2013 Agreements Between Africare, CDS, and DLL

In early 2013, representatives from CDS began to talk to Africare about a possible

lease for new Xerox-brand copiers.  CDS sales representatives Michael Gross and Ryan

Morrison visited Africare's offices and communicated via phone and email with Africare's Chief

of Staff/Marketing and Development Officer Kendra Davenport and Africare's Regional

Director of Business Development Katelyn Brewer.

These parties first met on April 10, 2013, soon after Africare had leased the

Toshiba copiers.  CDS salespeople toured Africare's facilities; discussed Africare's copier

contracts and lease payments as well as its outside printing requirements; and talked about

potential opportunities for CDS to provide sponsorships and donations to Africare.  Africare

thereafter forwarded to CDS its new copier contracts with CIT and an estimate of Africare's

outside printing costs.  CDS responded with a cost estimate if Africare leased two Xerox copiers

through CDS.  CDS projected a monthly savings of approximately $2,200 if Africare:

1) used Xerox copiers for print jobs instead of outsourcing them and 2) reduced its use of HP

Inc. (HP) printers and renegotiated its maintenance agreement for the Toshiba copiers leased

through CIT.[6]

Africare and CDS personnel met for a second time on April 26, 2013.  In a

follow-up, Mr. Gross of CDS sent an email to Ms. Brewer of Africare that projected that CDS

---

[6] It is unclear how the Toshiba copiers were maintained.  The CIT Lease did not include
maintenance services.  *See* CIT Lease ¶ 7 (noting that Africare is required to "supply all parts
and servicing required").

would provide multiple business services and advantages, including: "assist[ing] in eliminating the use of HP Printers"; "writ[ing] a template for Africare to use with Nauticon to restructure the [Toshiba] service agreement"; "commit[ting] to sharing [CDS's] [p]rint shop list for Africare to further reduce expenses"; and "commit[ting] to sharing [CDS's] local customer database for Africare to tap into for further resources, donations and sponsorships." Ex. Y, Def. CDS's Mot. for Summ. J. (CDS Mot.), Case No. 17-cv-1712 [Dkt. 35-7]. Mr. Gross further stated that CDS would donate $10,000 to Africare "for a sponsorship or donation" in exchange for an Africare lease of Xerox copiers. *Id.*[7] Mr. Gross told Africare that CDS would, over the next eighteen months, "evaluate the use of Toshiba[] [copiers] and determine their time for replacement," at which time CDS "would pay off the remaining payment stream" owed by Africare on their lease. *Id.*

On April 30, 2013—exactly eight weeks after the Nauticon documents were signed—Ms. Davenport executed a lease with DLL for two Xerox copiers and a maintenance agreement with CDS to maintain them. *See* Ex. B, CDS Mot., 2013 Maintenance Agreement [Dkt. 35-4]; Ex. F, Opp'n, 2013 Lease Agreement [Dkt 40-4]. Africare paid monthly fees and print charges to CDS under the 2013 Maintenance Agreement and $1,958 each month for the 60-month lease from DLL, totaling $117,480 (equal to $979/month or $58,740/60 months per copier) to lease the two Xerox copiers for five years. CDS had arranged the DLL financing for Africare.

On July 8, 2013, CDS sent Africare a letter that "confirm[ed] that [CDS] will be sending [Africare] a check in the amount of $10,000.00 as a donation to be used at Africare's

---

[7] Mr. Gross initially wrote that CDS would donate $5,000 to Africare. However, Ms. Brewer replied that Africare and CDS had discussed a donation of $10,000 during their in-person meeting. Mr. Gross then confirmed that CDS would donate $10,000.

discretion." *See* Ex. 1, Aff. of Samuel Vitale, 2013 Letter Agreement, Case No. 17-cv-1712 [Dkt. 35-9]. The 2013 Letter Agreement was executed by Mr. Gross for CDS and by Ms. Brewer for Africare. CDS sent the check which Africare treated as a donation.

### D. The 2015 Agreements Between Africare, CDS, and DLL

In early 2015, CDS suggested that Africare lease five more Xerox copiers instead of the five Toshiba machines which were still under lease with CIT. CDS sent a maintenance agreement for five new copiers to Africare by email on March 12, 2015. CDS again obtained financing for Africare through DLL and sent Africare a proposed lease agreement with DLL requiring 60 monthly payments of $4,610 to DLL (a total of $276,600 or $922/month and $55,320/60 months for each copier). Ms. Davenport signed both agreements on behalf of Africare on March 19, 2015. *See* Ex. E, CDS Mot., 2015 Maintenance Agreement [Dkt. 35-4]; Ex. R, Opp'n, 2015 Lease Agreement [Dkt 40-4].

As a part of the 2015 maintenance/lease arrangement, CDS sent Africare a letter which stated, "CDS will send Africare a check in the amount of $100,000 to cover the remaining lease payments [under the CIT Lease] and ship back costs of your current machine[s]," including a "$10,000 contribution to be used where [Africare] need[s] it most." *See* Ex. F, CDS Mot., 2015 Letter Agreement [Dkt. 35-4]. Ms. Davenport signed the Letter Agreement on March 19, 2015, at the same time that she signed the 2015 Maintenance and Lease Agreements.

On April 22, however, Earlene Barnes, then-Senior Director of Human Resources for Africare, sent an email to Mr. Gross, expressing concern that Africare did not need five new copiers and asking to review the Maintenance and Lease Agreements before their delivery. Mr. Gross responded that "knowing your account the way we do," five copiers were "best" for Africare. Ex. AA, CDS Mot. [Dkt. 35-8]. Without further objection from Africare, it accepted delivery of all five new Xerox copiers on April 28, 2015.

6

The promised $100,000 check from CDS caused concern within that company. On May 18, 2015, Evelyn Zimmerman, the CDS financial controller, told a colleague, Salman Javed, that she was "uncomfortable with send[ing] a [single] 100K check to a customer based on [the 2015 Letter Agreement] . . . [v]ery vague for sure." Ex. W, Opp'n, Email Correspondence between Ms. Zimmerman and Mr. Javed [Dkt. 40-4]. Mr. Javed responded, "We will not be sending out 100k all upfront. I am livid that [CDS Maryland] made this deal." *Id.* Samuel Vitale, the President of CDS, then sent Mr. Gross the following email on May 26, 2015 outlining Africare's options:

> To send [Africare] $100,000.00 at one time, we would need them to retain [the Toshiba printers] at their location. We would not charge them to have us deliver their old machines back to their facility. We would deliver the check at that time. If we are to continue to retain the units at our office, then we would like them to forward the monthly invoice from the leasing company to us, and we will make that payment . . . . If they go this route, we will not send them the $100,000.00, but instead send them a check in the amount of $10,000.00 as a donation towards their good works.

Ex. X, Opp'n [Dkt. 40-4].

Minutes after receiving this email from Mr. Vitale, Mr. Gross sent an email to Ms. Davenport and notified her that "he just received word . . . that [CDS] would be paying [for the] Toshibas for you." Ex. DD, CDS Mot. [Dkt. 35-8]. Mr. Gross advised that he "just need[ed] the [CIT] invoice and [CDS would] pay it directly for [Africare]." *Id.* He asked if "there [were] someone else [that Ms. Davenport] had assigned [at Africare] . . . to take care of the [CIT] invoices" and to "let [him] know" who that person was. *Id.*[8]

---

[8] According to Mr. Gross's deposition testimony, he relayed the options outlined by Mr. Vitale to Ms. Barnes and she said that Africare could not store the Toshiba copiers. Ex. J, CDS Mot., Gross Dep. [Dkt. 35-5] at 321-28. This conversation, which Ms. Barnes did not recall, is said to have occurred before Mr. Gross sent his email to Ms. Davenport.

CDS subsequently took possession of the Toshiba copiers. While CIT continued to send invoices to Africare, the non-profit merely forwarded them to CDS, which began paying CIT directly in June 2015. CDS made a total of 25 monthly payments to CIT, totaling $87,025. Africare SOF to CDS Mot. [Dkt. 40] ¶ 5; Africare SOF to CIT Mot [Dkt. 40] ¶ 12.

### E. Africare Stopped Payments

In June 2015, Africare underwent a reduction-in-force that decreased its work force by approximately one-third, due to a "financial downturn due in part to a decrease in federal government grants." Opp'n at 11. Africare had not communicated its deteriorating financial condition to CDS when it signed the 2015 Maintenance and Lease Agreements with CDS and DLL on March 19th.

However, Africare contacted CDS in August 2016 and attempted to renegotiate its maintenance and lease agreements. Ms. Barnes asked Mr. Gross via email if Africare could return four copiers that it was not using. Mr. Gross replied that Africare would be responsible for paying the full lease amount plus a large penalty for early termination. In November 2016, Robert Mallett, Africare's Chief Executive Officer (CEO) and President who had joined Africare in November 2015, wrote to CDS and asked it to use its "discretion" to adjust the contractual terms to Africare's benefit; in lieu of modification, Mr. Mallett asked CDS to terminate the 2013 and 2015 Maintenance Agreements immediately and waive any and all penalties or early termination fees. Ex. OO, Opp'n, 11/15/16 Letter from Mr. Mallett to Mr. Gross. Africare and CDS engaged in further correspondence about revising the Maintenance Agreements, but the

negotiations did not result in any amendments.  *See* Ex. PP, Opp'n, Email Correspondence

between Mr. Vitale and Mr. Mallett.[9]

Africare stopped all payments to DLL under the 2013 and 2015 Lease

Agreements after September 2016.  Africare SOF to Mot. For Summ. J. and Req. for Hearing of

DLL (Africare SOF to DLL Mot.), Case No. 17-cv-1945 [Dkt. 48] ¶¶ 13, 36.  It stopped all

payments for maintenance to CDS in June 2017.  Africare SOF to CDS Mot. ¶ 68.  CDS stopped

all payments to CIT on Africare's behalf for the Toshiba copiers in July 2017.  *Id.* ¶ 66.

On January 20, 2017, DLL declared Africare in default of the 2013 and 2015

Lease Agreements.  Per the leases, DLL accelerated the remaining payments and demanded

immediate payment of the combined balance in the amount of $289,620.96, plus 18% interest

from the date of default.  Ex. E, DLL Mot., Cohen Decl., Case No. 17-cv-1945 [Dkt. 47-5]

¶¶ 10-15.  Asset Recovery Services repossessed all seven Xerox copiers from Africare on DLL's

behalf; it later sold the seven copiers in 2018 for a total of $4,300, of which DLL recovered

$1,823.70.

**F.  Procedural History**

DLL sued Africare in the Court of Common Pleas of Chester County,

Pennsylvania less than a month later, on February 16, 2017.  It alleged two counts of breach of

contract and one count of unjust enrichment.  On March 22, 2017, Africare removed the case to

---

[9] The email correspondence also included discussions about the 2013 and 2015 Lease
Agreements with DLL.  Mr. Vitale advised Mr. Mallett that the "first lease" was "now eligible
for an early upgrade" but that the "second lease" was "only a year old" and "[t]here is no way to
reduce costs . . . at this time."  *Id.*  Mr. Mallett acknowledged receiving Mr. Vitale's email and
noted that Africare would respond; it is unclear if Mr. Mallett sent a further response.

the U.S. District Court for the Eastern District of Pennsylvania and alleged a counterclaim of contract breach with its answer.

Africare sued CDS and CIT in this Court on August 22, 2017. It alleged breach of contract and breach of the covenant of good faith and fair dealing against CDS. It also sought a declaratory judgment against both CIT and CDS that Africare owed no money to either Defendant.[10] Both CDS and CIT counterclaimed for breach of contract and CDS added a claim of unjust enrichment. Shortly thereafter, Africare and DLL moved to transfer their suit from Pennsylvania to D.C. That motion was granted.

Upon transfer, the two cases were consolidated for the purposes of discovery. At the close of discovery, the Court ruled that the cases would remain consolidated through summary judgment. Before the Court are ripe motions for summary judgment filed by CDS, CIT, and DLL and Africare's combined opposition to all motions.[11]

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure states that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is "material" if it is capable of affecting the substantive outcome of litigation. *Anderson*, 477 U.S. at 248. A dispute is "genuine" if there

---

[10] Africare seeks only a declaratory judgment with respect to CIT.

[11] CDS Mot. [Dkt. 35]; Mem. of P & A in Supp. of CDS Mot. (CDS Mem.) [Dkt. 35-1]; CIT Mot. [Dkt. 39]; Mem. of P & A in Supp. of CIT Mot (CIT Mem.) [Dkt. 39-2]; DLL Mot., Case No. 17-cv-1945 [Dkt. 47]; Mem. of P & A in Supp. of Mot. for Summ. J. of DLL (DLL Mem.), Case No. 17-cv-1945 [Dkt. 47]; Opp'n; Reply Mem. of P. & A. in Further Supp. of CDS's Mot. for Summ. J. (CDS Reply) [Dkt. 44]; Reply Mem. in Further Supp. of CIT Mot. for Summ. J. (CIT Reply) [Dkt. 46]; Reply in Supp. of Mot. for Summ. J. of DLL (DLL Reply) [Dkt. 50].

is sufficient admissible evidence such that a reasonable jury could return a verdict for a non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, a court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id*. at 252. The nonmoving party must point to specific facts showing that a genuine issue of material fact requires trial. *Celotex*, 477 U.S. at 324. The nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id*. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

### III. ANALYSIS

#### A. Jurisdiction

Diversity jurisdiction exists over the allegations advanced by Africare, CIT, and CDS under 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties: Africare is a non-profit incorporated and headquartered in D.C.; CIT is a Delaware company with its principal place of business in New Jersey; and CDS is incorporated and headquartered in Maryland. Similarly, diversity jurisdiction exists over the claims in the lawsuit initiated by DLL against Africare because DLL is a

Pennsylvania corporation, Africare is incorporated and headquartered in D.C., and the amount in controversy also exceeds $75,000.

Venue is proper in the District of Columbia because a substantial part of the events at issue occurred here inasmuch as the lease and maintenance agreements were performed at Africare's headquarters in D.C. *See* 28 U.S.C. § 1391(b)(2). None of the parties contests personal jurisdiction in D.C.

## B. Applicable Law

"When a federal court must decide issues regulated only by state law, the court 'applies the forum state's choice-of-law rules.'" *DuBois v. Washington Mut. Bank*, No. 10-5333, 2012 WL 5882567, at *1 (D.C. Cir. Nov. 8, 2012) (quoting *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995)). This Court must apply the choice-of-law rules of the District of Columbia in evaluating the motions for summary judgment.

"District of Columbia courts give effect to contractual choice of laws provisions as long as there is some reasonable relationship with the state specified." *PCH Mut. Ins. Co., Inc. v. Casualty & Sur.*, 569 F. Supp. 2d 67, 72 (D.D.C. 2008) (internal quotation marks and citations omitted). Absent an effective choice of law provision, the court considers which of the relevant jurisdictions has the more substantial interest in having its law applied and the more significant relationship to the litigation. *Id.* at 72-73. In a breach of contract dispute, "this analysis centers on five factors: [1] the place of contracting, [2] the place of negotiation of the contract, [3] the place of performance, [4] the location of the subject matter of the contract, and [5] the domicil[e], . . . place of incorporation and place of business of the parties." *Bode & Grenier, LLC v. Knight*, 808 F.3d 852, 864 (D.C. Cir. 2015) (internal quotations omitted).

### 1. Africare and CDS

The 2013 and 2015 Maintenance Agreements between CDS and Africare have a New Jersey choice-of-law clause. Africare asserts that the law of the District of Columbia should instead control the CDS motion because New Jersey has no reasonable relationship to the agreements. Africare points out that it is a non-profit incorporated and headquartered in D.C and CDS is a Maryland LLC; in addition, the 2013 and 2015 Maintenance Agreements were negotiated and performed in D.C., which was also the location of the subject matter of the contracts (copiers) at applicable times. CDS contends that the New Jersey choice-of-law clause is effective and controlling, but agrees that the pertinent legal principles under New Jersey and D.C. law are similar so CDS "accept[s] the application of District of Columbia law to this motion." CDS Reply at 6 n.1.

Because New Jersey has no apparent relationship to the dispute; the relevant legal principles in New Jersey do not conflict with D.C. law; and CDS does not contest the application of the law of the District of Columbia, which has a substantial interest in having its law applied, the Court will apply D.C. law.

### 2. Africare and CIT

The CIT Lease provides that the contract "shall be governed and construed in accordance with the laws" of Maryland. Africare asserts that D.C., not Maryland law, should apply because neither CIT nor Africare has any relationship to Maryland. CIT contends that the Maryland choice-of-law clause is valid but cites D.C. law in responding to Africare's arguments, which are made under D.C. law.

The State of Maryland has no apparent relationship to the dispute between CIT and Africare. Moreover, "D.C. and Maryland courts employ similar principles of contract interpretation." *Chambers v. Nasa Fed. Credit Union*, 222 F. Supp. 3d 1, 8 (D.D.C. 2016)

(citing *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983) (noting that Maryland law is the "source of the District's common law and an especially persuasive authority when the District's common law is silent")). CIT has shown no relevant difference in case law between the District of Columbia and Maryland.

The Court will apply D.C. law to the suit between Africare and CIT.

### 3. *Africare and DLL*

The 2013 and 2015 Lease Agreements between DLL and Africare have Pennsylvania choice-of-law clauses. Neither party contests that these clause are controlling. The Court will enforce these clauses, as DLL is a Pennsylvania corporation, that state has a reasonable relationship to the litigation, and the parties agree.

## C. Africare's Claims Against CDS

The Africare Complaint alleges breaches of five distinct agreements: (1) the 2013 CDS Agreement, (2) the 2013 Maintenance Agreement, (3) the 2015 Maintenance Agreement, (4) the 2013 Letter Agreement, and (5) the 2015 Letter Agreement.[12]

Africare asserts that the 2013 CDS Agreement consisted of "CDS's representations and warrants, made in emails and orally," before Africare leased two Xerox copiers in 2013. Africare Compl. ¶ 18. This included CDS representations that "(1) [] CDS would make a charitable contribution to Africare in the amount of $10,000, (2) the use of Xerox copiers would lower costs and save Africare money, and (3) the new Xerox copiers suggested by [] CDS were appropriate and suitable for Africare's needs, size, and financial condition." *Id.*

---

[12] The Complaint also mentions a "2015 CDS Agreement" but this appears to be synonymous with the 2015 Maintenance Agreement. *See* Africare Compl., Case No. 17-cv-1712 [Dkt. 1] ¶ 34 (noting that pursuant to the 2015 CDS Agreement, "CDS . . . took the five Toshiba printer-copiers from Africare's office and replaced them with five Xerox printer-copiers in addition to the two Xerox printer-copiers from the 2013 deal").

¶ 16. Africare argues that the 2013 CDS Agreement "was an enforceable contract memorialized in emails." *Id.* ¶ 18.

Africare contends that CDS breached the 2013 CDS Agreement—as well as the 2013 Maintenance Agreement and the 2013 Letter Agreement—by falsely representing "that [CDS] would (1) make an actual charitable contribution of $10,000, not one that in reality was financed by Africare by means of above-market financing terms; (2) save Africare money and improve productivity; and (3) provide new printer-copiers that were appropriate in number, type, and capabilities for Africare's needs, size, and financial condition." *Id.* ¶ 61.

Africare further alleges that CDS breached the 2015 Maintenance Agreement and the 2015 Letter Agreement by falsely representing that:

> [CDS] would (1) pay off the CIT Lease all at once and in its entirety and relieve Africare of its entire financial obligation to pay CIT as well as ship back all of the Toshiba printers to CIT; (2) make an actual charitable contribution of $10,000, not one that in reality was financed by Africare by means of above-market financing terms; (3) save Africare money and improve its productivity; and (4) provide new printer-copiers that were appropriate in number, type, and capabilities for Africare's needs, size, and financial condition.

*Id.* ¶ 62.

Africare further asserts that CDS breached the implied covenant of good faith and fair dealing with respect to all agreements, including by failing to disclose its business relationship with DLL; failing to disclose that Africare was paying above-market rates and, thus, actually financing CDS charitable contributions to Africare; failing to disclose fully and explain terms in the 2013 and 2015 Lease Agreements; making unspecified false representations without correction; inducing Africare to lease copiers that were not suitable for its needs; making false representations about cost-savings and improved productivity; and failing to pay off the CIT Lease in full, thus exposing Africare to ongoing liability to CIT.

A breach of contract claim under D.C. law has four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Ihebereme v. Capital One., N.A.*, 730 F. Supp. 2d 40, 47 (D.D.C. 2010) (citation and quotation marks omitted). In addition,

> All contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. A party breaches this duty by evading the spirit of the contract, willfully rendering imperfect performance, or interfering with performance by the other party. The test for determining whether a Defendant's actions breached the covenant of good faith and fair dealing is a reasonableness inquiry.

*Paulin v. George Washington Univ. Sch. of Med. And Health Scis.*, 878 F. Supp. 2d 241, 247-48 (D.D.C. 2012) (internal quotes and citations omitted). Conduct is unfair and not in good faith if it is arbitrary and capricious. *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 189 (D.D.C. 2016) (citing *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013)). Importantly, the duty of good faith and fair dealing "cannot contradict, modify, negate, or override the express terms of a contract." *Billups v. Lab. Corp. of America*, 233 F. Supp. 3d 20, 26 (D.D.C. 2017) (citing 17A C.J.S. Contracts § 437 (2016)). Rather, the duty of good faith and fair dealing is an interpretive lens through which courts evaluate the parties' reasonable expectations for the fulfillment of the terms of the contract.

"The District of Columbia follows the 'objective' law of contracts, which generally means that 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.'" *Armenian Assembly of Am.,*

*Inc. v. Cafesjian*, 758 F.3d 265, 278 (D.C. Cir. 2014) (quoting *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)).

### 1. The 2013 CDS Agreement and Parol Evidence

CDS argues that the 2013 CDS Agreement is not an enforceable contract and fails under the parol evidence rule.  Under D.C. law, "[t]he parol evidence rule provides that when parties to a contract have executed a (1) completely integrated written agreement with (2) terms that are plain and unambiguous, no evidence of prior or contemporaneous agreements or negotiations may be admitted which would either contradict or add to the writing."  *Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 32 (D.D.C. 2015).  "This rule applies with even greater force if the contract contains a clause—usually referred to as a 'merger clause' or an 'integration clause'—indicating that the contract represents a complete and final expression of the parties' wishes."  *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 113 (D.D.C. 2013) (citing *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 928 n.17 (D.C. 1992)).

In line with this case law, CDS argues that the 2013 Maintenance Agreement is a fully integrated contract because it contains an integration clause:

> The Agreement represents the final and only agreement between [Africare] and [CDS] and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements.  The Agreement can be changed only by a written agreement between [Africare] and [CDS].  Other agreements not stated herein are not binding on [CDS].

2013 Maintenance Agreement, Introductory Clause.  CDS insists that the integration clause bars reliance on any prior representations in connection with the 2013 Maintenance Agreement, including representations made—either orally or by email—that CDS would make a charitable contribution of $10,000, that the copiers would save Africare money, or that the copiers were suitable for Africare's size and financial condition.

The Court finds that the 2013 Maintenance Agreement was fully integrated within the meaning of D.C. law. *See Ju v. Carter*, No. 14-391 (CKK), 2015 WL 5168251, at * 6 (D.D.C. Aug. 31, 2015) ("The Court concludes that the detailed written agreement, signed by the parties [and containing an integration clause] is fully integrated."). The parol evidence rule, therefore, bars consideration of the extrinsic evidence of additional promises made before the 2013 Maintenance Agreement was signed on which Africare now seeks to rely. As a result, the 2013 CDS Agreement is not an enforceable contract.

### 2. 2013 and 2015 Maintenance Agreements

The 2013 and 2015 Maintenance Agreements required CDS to supply ink, toner, and furnish other maintenance services for the Xerox copiers Africare leased from DLL. Each of them qualifies as a contract. The Complaint alleges that CDS breached both Maintenance Agreements by making false representations during contract negotiations that the equipment was appropriate, would save money, and would make Africare more productive.

CDS denies any breach and cites the deposition testimony of Africare CEO Mallett, who admitted that CDS did not breach either Maintenance Agreement. *See* Ex. X, CDS Mot., Mallett Dep. [Dkt. 35-7] at 246 ("I don't know any terms that they have necessarily violated in the [2013 Maintenance Agreement] itself[.]"); *id.* at 247 ("I am hard pressed sitting here being refreshed by reading this agreement to say that there was a violation of the [2013 Maintenance Agreement]."); *id.* at 264 ("There is no term here that I see in [the 2015 Maintenance Agreement] that I would be willing to say was violated in some way by CDS.").

Africare provides no argument concerning the alleged CDS breach of the two Maintenance Agreements and does not address the admissions by Mr. Mallett. Rather, Africare only addresses the Maintenance Agreements in connection with its defenses of fraudulent inducement and unconscionability. "It is well understood in this Circuit that when a plaintiff

files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003). By its silence, Africare has conceded that CDS did not breach the 2013 or 2015 Maintenance Agreements.

### 3. *2013 Letter Agreement*

The 2013 Letter Agreement memorialized CDS's commitment to make a $10,000 donation to Africare. *See* 2013 Letter Agreement (stating that "[CDS] will be sending [Africare] a check in the amount of $10,000.00 as a donation to be used at Africare's discretion"). The 2013 Letter Agreement was dated July 8, 2013, approximately two months after the 2013 Maintenance and Lease Agreements were executed.

Africare acknowledges that CDS sent $10,000 to Africare and that it treated the money as a donation. *See* Africare Compl. ¶ 22 ("Africare did eventually receive a check from [] CDS in the amount of $10,000 and treated it as a charitable donation."). However, Africare claims that "the so-called $10,000 charitable contribution was factored into the cost of Africare's leasing the Xerox printer-copiers" which CDS did not disclose and which meant that CDS "was actually providing a high-interest loan of $10,000 to Africare that Africare financed through the 2013 Lease Agreement." *Id.* ¶ 27. It relies solely on the following deposition testimony of Ms. Brewer:

> The conversation around the [2013] donation was a bit gray. I expressed that we could not afford, in addition to the current lease, the price of two new copiers per month. And so the conversation around the donation was—Michael[] [Gross's] suggestion was that it was for—to help cover some of the costs of the two new printers.

Ex. N, CDS Mot., Brewer Dep. [Dkt. 35-6] at 31-32.

This testimony reflects only that Mr. Gross suggested the donation would help to cover the cost of adding two Xerox copiers to the five Toshiba copiers Africare already leased, not that the donation was somehow factored into a higher-than-usual price for Xerox machines. It is apparently true that the Xerox copiers were more expensive than the Toshiba copiers, but the price differential does not, by itself, establish that the Xerox equipment was over-priced and not just more costly. Without such evidence of less expensive maintenance for Xerox copiers leased to others, Ms. Brewer's testimony does not raise a genuine issue of material fact over the maintenance costs charged by CDS. Africare has failed to overcome the CDS motion for summary judgment as to the 2013 Letter Agreement. *See Anderson*, 477 U.S. at 252.[13]

### 4. 2015 Letter Agreement

The 2015 Letter Agreement stated that "CDS will send Africare a check in the amount of $100,000 to cover the remaining lease payments [under the CIT Lease] and ship back costs of your current machine[s]," including a "$10,000 contribution to be used where [Africare] need[s] it most." 2015 Letter Agreement. Africare asserts that CDS breached the 2015 Letter Agreement because CDS failed to (1) pay off the CIT Lease completely and immediately, (2) return the Toshiba machines to CIT, and (3) provide an actual $10,000 donation to Africare.

CDS acknowledges that the 2015 Letter Agreement, at the time of execution, required CDS to send Africare a single check for $100,000.[14] This amount consisted of a

---

[13] The above analysis accepts the parties' position that the 2013 Letter Agreement is an enforceable contract. *But see Zoob v. Jordan*, 841 A.2d 761, 765 (D.C. 2004) ("[A] mere promise to make a gift is unenforceable.").

[14] Both parties agree that the 2015 Letter Agreement is an enforceable contract. The Court agrees. The 2015 Letter Agreement was executed on March 19, 2015, at the same time as the 2015 Maintenance and Lease Agreements, with which it was inextricably linked. This conclusion is demonstrated by the copies of the 2015 Letter Agreement submitted by both Africare and CDS, which include the 2015 Maintenance and Lease Agreements as attachments.

$10,000 charitable donation and $90,000 to pay off the CIT Lease.  CDS admits that it did not

send Africare a single $100,000 check.  However, it argues that Africare agreed to modify the

agreement so that CDS would send Africare a $10,000 donation immediately and would make

lease payments directly to CIT each month as they became due.

Africare retorts that it never meaningfully accepted a contract modification and,

while it sent CIT invoices to CDS for payment, it did so only because CDS gave it no choice in

the matter.  Africare asserts that it merely followed imposed terms so that its conduct was

insufficient to modify the contract.  In addition, Africare acknowledges that it received a $10,000

contribution from CDS in June 2015, although the non-profit again contends, without supporting

evidence, that the money was factored into the CDS maintenance costs and was really a high-

interest loan.

The record facts help to determine the matter.  It is uncontested that on May 26,

2015, Mr. Gross sent an email to Ms. Davenport, who had signed the 2015 Letter Agreement for

Africare, and notified her that CDS would thereafter pay Africare's CIT Lease invoices directly.

Ex. DD, CDS Mot.  There is no evidence of any objection to these modified payment terms and

Ms. Davenport later characterized her email exchange with Mr. Gross as an "agreement" and

testified that she understood that CDS would make payments on the CIT Lease on a going-

forward basis.  Ex. L, CDS Mot., Davenport Dep. [Dkt. 35-6] at 106.

Africare claims that its administrative assistant, Jomeka Dyer, is identified by

CDS as having agreed to the modification and that Ms. Dyer had no such authority.  The written

record belies this claim.  On August 24, 2015, Mr. Gross explained the CIT Lease payment

---

*See* Ex. XX, Opp'n, 2015 Letter Agreement [Dkt. 40-5]; Ex. F, CDS Mot, 2015 Letter
Agreement.  CDS has not argued that the 2015 Letter Agreement was fully integrated.

structure in an email response to a question from Dexter Lockamy, then Africare's Chief

Financial Officer (CFO). Mr. Gross explained:

> After we delivered your machines, it was determined it would be better to pay your monthly payment on the amount Africare owed versus sending Africare the whole check. So, we sent the $10,000 donation right away and then I was directed to Jomeka Dyer to take care of the invoices. I went over this with Jomeka many months back and she has been sending us your old invoices. We have been paying them for you ever since. The reason we did that[] is that we are storing your old equipment. If Africare was able to store the old equipment, then we would send you the whole check to take care of the balance. But, [s]pace was an issue and nobody wanted the old equipment in the way.

Ex. EE, CDS Mot, Email Correspondence between Mr. Gross and Mr. Lockamy [Dkt. 35-8].

This email exchange does not suggest that Ms. Dyer accepted the modification; rather, Mr. Gross

was directed to Ms. Dyer for the administrative task of sending the monthly CIT invoices to

CDS.

Indeed, Mr. Gross informed Mr. Lockamy that CDS would send Africare a check

for the remainder of the $90,000 it owed if Africare were willing to retain possession of the

Toshiba copiers: "If for any reason you want to hold all of the old [Toshiba] equipment and

want the remainder of the check to take care of on your own, just let us know and we can make

that happen as well. No [p]roblem at all." *Id.* Mr. Lockamy did not request a lump-sum

payment as Mr. Gross offered. Instead he later asked Mr. Gross to provide documentation of the

payments CDS was making on Africare's behalf so that he could give it to Africare's auditors.

*Id.*

Between June 2015 and July 2017, Africare forwarded the monthly invoices it

received from CIT to CDS, which then paid CIT directly. CDS made 25 monthly payments of

$3,481 to CIT, totalling $87,025. Africare SOF to CDS Mot. ¶ 5; Africare SOF to CIT Mot ¶ 12.

The D.C. Court of Appeals has recognized that "mutual, consistent, and contrary behavior deviating from the precise language of the parties' contract[] can implicitly demonstrate the parties' intent to modify the literal terms of the contract, and that such intent should be given legal effect." *2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 90 (D.C. 2019). "For example, . . . a contract may be deemed modified if the parties' course of conduct is consistent with acceptance of the modified conditions." *Id.* (citations omitted).

Here, the evidence strongly indicates that through Mr. Gross for CDS and Ms. Davenport for Africare the parties mutually agreed to revise the payment terms of the 2015 Letter Agreement and demonstrated that agreement through their course of conduct when Africare forwarded CIT invoices to CDS on a monthly basis for over two years, and CDS paid these invoices as they became due. There is no evidence that Africare objected to this arrangement. To the contrary, contemporaneous correspondence and deposition testimony confirm this understanding. *See 2301 M St. Coop. Ass'n*, 209 A.3d at 90.

Finally, Africare argues that CDS breached the 2015 Letter Agreement because it did not fully pay all CIT Lease invoices. CDS stopped making payments to CIT after July 5, 2017 when there was still an outstanding balance—$7,193.00 for past-due monthly payments and $20,704.46 for the remaining payments[15]—which CIT now seeks from Africare. CIT Mem. at 7. CDS stopped making such payments only after Africare stopped making payments on the CDS 2013 and 2015 Maintenance Agreements. The record facts again strip Africare's argument—that CDS agreed to, but did not, pay off the entire CIT Lease at once—of any force. *See Noble Energy, Inc. v. Salazar*, 671 F.3d 1241, 1243 n.3 (D.C. Cir. 2012) ("Under the common law rule of discharge, one party's material breach of a contract will excuse the other

---

[15] The remaining payments are discounted at 3% pursuant to Section 15 of the CIT Lease.

party's performance."). Africare admits that it stopped paying CDS under the 2013 and 2015 Maintenance Agreements in June 2017. Since the 2015 Letter Agreement and the 2015 Maintenance Agreement constituted a single contract, when Africare breached the 2015 Maintenance Agreement, the common law rule of discharge excused CDS from its obligations under the 2015 Letter Agreement.

Summary judgment will be granted in favor of CDS on Africare's allegation that CDS breached a contract between the two.[16]

### D. The CDS Claim that Africare Breached Their Agreements

CDS counterclaims that it was Africare that breached the 2013 and 2015 Maintenance Agreements by failing to make payments and that CDS performed its obligations until legally excused. CDS seeks an award of $10,291.73 in unpaid maintenance invoices and late charges.

Africare concedes that CDS did not breach the 2013 and 2015 Maintenance Agreements and that it stopped making payments for both in June 2017. *See* Mallett Dep. at 246-47, 264. There is no dispute that unpaid invoices and late charges amount to $10,291.73. However, Africare asserts that it has legitimate defenses.

#### 1. Fraudulent Inducement Defense

Africare posits numerous disputed issues of material fact concerning fraudulent inducement by CDS to get Africare to sign the 2013 and 2015 Maintenance Agreements.

---

[16] Summary judgment will also be granted in favor of CDS on the allegation that CDS breached the implied covenant of good faith and fair dealing because the facts and arguments underlying that count are the same as those underlying the dismissed breach of contract claim. *See* Africare Compl. ¶ 63.

As argued by Africare, fraudulent inducement to the making of a contract renders it "voidable by the adversely affected party," *Steiner v. Am. Friends of Lubavitch*, 177 A.3d 1246, 1255 (D.C. 2018), so that the injured party "may elect to avoid any legal obligations under the contract." *Schmidt v. Shah*, 696 F. Supp. 2d 44, 63 (D.D.C. 2010). To prove fraudulent inducement, a party must demonstrate "(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken . . . in reliance upon the representation, (6) which consequently resulted in provable damages." *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 195 (D.D.C. 2016) (citation omitted).[17]

When fraudulent inducement is pled as a defense, as here, the parol evidence rule does not generally apply and courts may consider extrinsic evidence. *Carter v. Urban Serv. Sys. Corp.*, 324 F. Supp. 3d 19, 33 (D.D.C. 2018) (citing *Hercules & Co.*, 613 A.2d at 929 ("The parol evidence rule does not apply when a party to a contract alleges that parol representations were fraudulently made."); Restatement (Second) of Contracts § 214(d) (1981) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible . . . to establish . . . illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause.") (additional citations omitted)).

### a. The Promise to Pay off Africare's Liability to CIT in Full

The first example of fraudulent inducement advanced by Africare is that "CDS *never* intended to honor its promises [in 2015] to send Africare a lump sum payment of $100,000

---

[17] Under D.C. law the requirements for a fraudulent inducement "are essentially the same as those for a fraudulent misrepresentation claim." *Id.* at 195 n.1 (citing *In re U.S. Office Products Co. Secs. Lit.*, 251 F. Supp. 2d 77, 99-101 (D.D.C. 2003) ("The elements of fraud and fraudulent inducement are the same" and "[f]raudulent inducement to enter a contract requires a misrepresentation or omission that pertains to an essential term of a contract and the intent to convince a plaintiff to enter the contract." (citations omitted)).

or pay off Africare's liability to CIT in full." Opp'n at 39. Africare cites the May 18, 2015 email between Ms. Zimmerman and Mr. Javed, in which she stated that she was "uncomfortable with send[ing] a 100K check to a customer based on [the 2015 Letter Agreement] . . . [v]ery vague for sure" and Mr. Javed agreed. Ex. W, Opp'n.

Unfortunately for Africare, this email exchange does not support its argument. The 2015 Letter Agreement, and all statements preceding its execution, occurred two months or more *before* this email exchange about payment and neither Ms. Zimmerman nor Mr. Javed was involved in negotiating or executing the 2015 Letter Agreement. While persons within CDS might later have questioned the wisdom of that Letter Agreement, their opinions do not indicate that CDS had no intention of honoring it when it was negotiated or signed. *See Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs.*, 878 A.2d 1226, 1234 (D.C. 2005) (holding that the fraudulent misrepresentation or inducement may be found "if at the time of its making, the promisor had no present intention of carrying it out").

A different email chain involving Ms. Zimmerman is cited by Africare in its attempt to show that "CDS *never intended to pay off Africare's liability to CIT in full*." Opp'n at 39 (emphasis in original). On June 10, 2015, Ms. Zimmerman asked Mr. Vitale, both at CDS, to tell her "how many months [were] left on the [CIT] lease" so she [could] "calculate the bill correctly." Ex. YY, Opp'n, Email Correspondence between Ms. Zimmerman and Mr. Vitale [Dkt. 40-5]. Mr. Vitale responded, "Call it 25. Our obligation is 90k. So, the left over you can say is going towards [the] return of [the Toshiba] machine[s]." *Id.* Africare emphasizes the next statement by Mr. Vitale: "We have other gear at this location [the original two Xerox copiers] that is now 2 years into it's [sic] term. So, when we flip that, we plan to take care of this all together. Net/net, this won't get to the end of the lease, and it will be off the books." *Id.*

Africare insists that the statement "this won't get to the end of the lease" demonstrates that "CDS was never willing to follow through" on its promise to cover Africare's obligations to CIT. Opp'n at 39.

This raises the question of what the actual contract terms were between CDS and Africare. CDS expressed an intention to pay the costs of the Toshiba copiers. *See* Ex. Y, CDS Mot., 4/29/13 Email from Mr. Gross to Ms. Brewer (stating that CDS would, over the next eighteen months, "evaluate the use of Toshiba[] [copiers] and determine their time for replacement," at which time CDS "would pay off the remaining payment stream" owed by Africare on their lease). Ultimately, however, the 2015 Letter Agreement bound CDS to send Africare a check for $100,000, which included a $10,000 donation: "CDS will send Africare a check in the amount of $100,000 to cover the remaining lease payments and ship back costs of your current machine[s]," including a "$10,000 contribution." 2015 Letter Agreement. Ms. Davenport agreed to this amount when she signed the 2015 Letter Agreement. These payment terms were then changed by mutual conduct to require CDS to pay $90,000 in monthly installments to CIT, plus the donation.

The record does not explain why Africare accepted $90,000 as sufficient to pay all of the costs of the CIT Lease but the amount was never quite sufficient for that purpose. The CIT Lease required Africare to make 60 monthly lease payments of $3,481, totaling $208,860, and the 2015 Letter Agreement was signed approximately 24 months after the CIT Lease. It is unclear how a $100,000 payment, less a $10,000 charitable donation, would have "covere[d] the remaining lease payments" under the CIT Lease when, at the time the 2015 Letter Agreement was signed, Africare owed CIT approximately 36 monthly payments, or $125,316.[18] By the

---

[18] The Court assumes that the term of the 60-month CIT Lease began at the time it was signed.

Court's calculation, a $90,000 lump sum payment would result in Africare falling approximately $35,000 short of what it owed CIT.

Nevertheless, Mr. Vitale's June 2015 email recognized that CDS had obligated itself to pay $90,000 to cover the cost of the CIT Lease and to return the Toshiba copiers. These statements were fully consistent with the 2015 Letter Agreement. It appears that Mr. Vitale also predicted that CDS would attempt to "take care of this," when it replaced the two original Xerox copiers before the end of the CIT lease. Ex. YY, Opp'n. Not only is this statement much too late in time to show fraudulent inducement when the parties signed the 2015 Maintenance and Letter Agreements—which together are the relevant contract—but Africare stopped payments on the 2015 Maintenance Agreement before any action or inaction by CDS which might have demonstrated Mr. Vitale's prediction. Whatever was anticipated, Ms. Zimmerman then instructed others that she was "going to enter a CIT bill in for the 25 months that he is stating below ([$]87,025.55) and pay it down each month." *Id.* Finally, the proof is in the pudding: It is undisputed that CDS made a total of 25 monthly payments to CIT between 2015 and 2017, totalling $87,025. It stopped, just shy of the pledged $90,000, when Africare stopped paying for the 2015 Maintenance Agreement.

In short, the minimal evidence offered by Africare to show fraudulent inducement when CDS promised to pay for the CIT Lease ignores the limitation of $90,000, to which Africare agreed, and that CDS made all payments until Africare itself breached the agreement. These minimal facts show miscalculation but fail to raise a genuine and material dispute concerning fraudulent inducement.

b. Charitable Donations Promised by CDS

There is no genuine issue of material fact concerning the CDS payments of $10,000 in connection with the 2013 and 2015 Letter Agreements and that Africare treated them

as donations. However, Africare now argues that "[t]here are also disputed facts as to whether CDS promised to make *additional* donations that it did not make" as inducements to agree to the 2015 Maintenance Agreement. Opp'n at 42 (emphasis in original). Africare asserts that emails demonstrate that CDS promised to make an annual donation to Africare. For this purpose, Africare cites an email exchange in early 2015 between Ms. Brewer and Mr. Gross, in which he stated, "when we do . . . upgrade those [Toshiba] machines, I will also come up with another donation for 2015, to continue our partnership." *See* Ex. N, Opp'n, Email Correspondence between Ms. Brewer and Mr. Gross [Dkt. 40-4]. Ms. Brewer replied: "I appreciate your offer for Xerox's annual donation!" *Id.* In addition, Ms. Brewer testified that Mr. Gross had "indicated that there would be an annual donation" but that "2014     . . . was missed." Brewer Dep. at 33.

   Africare provides no further evidence regarding the purported offer of an annual donation by CDS. At best, it would appear that Ms. Brewer misunderstood Mr. Gross. Writing in early 2015, Mr. Gross made no reference to a donation in 2014. His entirely forward-looking promise was limited to "another donation for 2015" when the Toshiba machines were replaced with Xerox copiers. Further, even if there were a false representation in early 2015, of which there is no evidence, it would be legally irrelevant because it did not affect Africare's willingness to sign the 2015 Maintenance Agreement later in 2015 for the five new Xerox copiers. *See Intelsat*, 935 F. Supp. 2d at 112 ("A false representation is material if it is shown that the correct facts would have had a bearing on the action of a decision-maker.") There was no CDS donation to Africare in 2014 because "2014 . . . was missed." Brewer Dep. at 33. And yet Africare considered and signed the 2015 Maintenance Agreement. The Court concludes that these examples do not show fraudulent inducement.

c. CDS Promise of a Long-Term Partnership

Africare contends that "CDS promised on multiple occasions to Africare that it would be a 'partner' with Africare and support its mission" but never followed through on this promise and thus fraudulently induced the non-profit to contract with it. Opp'n at 43. In support, Africare identifies two emails from Ryan Morrison of CDS in which he used the term "partnership" to describe the potential relationship between CDS and Africare. *See, e.g.,* Ex. AAA, Opp'n, 5/9/12 Email from Mr. Morrison to Cynthia Carter[19] [Dkt. 40-6] ("I look forward to starting this partnership with Africare and continuing this process."); Ex. SS, Opp'n, 4/1/13 Email from Mr. Morrison to Ms. Davenport [Dkt. 40-5] ("I was told by my Senior Vice President specifically to reach out [to] your organization and to discuss possible partnerships and donation options for 2013.").

While these communications mentioned a partnership, neither defined its nature and only suggested further discussion. It must be noted that Mr. Morrison sent his first encouraging email on May 9, 2012, nearly a year *before* Africare signed the 2013 Maintenance Agreement with CDS; in context, the reference to a "partnership" could indicate only a close working relationship without other enforceable specificity. Moreover, the email from April 1, 2013 was merely an invitation by CDS "to discuss possible partnerships and donation options for 2013." CDS Reply at 10. The evidence shows that these discussions resulted in a $10,000 donation from CDS. Africare offers no additional statements or actions that made any greater commitment by CDS.

Africare also argues that CDS failed to fulfill its promise to "commit to sharing [its] local customer database for Africare to tap into further resources, donations, and

_____

[19] Africare does not provide Cynthia Carter's job title.

sponsorships." Ex. Y, CDS Mot., 4/29/13 Email from Mr. Gross to Ms. Brewer. The record indeed contains no evidence that CDS shared its "local customer database" with Africare. *See* Ex. K, CDS Mot., Morrison Dep. [Dkt. 35-5] at 81 (stating that he would have been responsible for sharing the database and that he did not recall doing so). But Africare itself never followed up with CDS to arrange access to this database. *See* Brewer Dep. at 158; Morrison Dep. at 131. It is also undisputed that Africare signed the 2015 Maintenance Agreement with CDS to maintain five additional Xerox copiers two years later, as well as the 2015 Letter Agreement, with nary a word or action by either party concerning this alleged promise. Assuming that CDS falsely represented that it would share its customer database in order to induce Africare to sign the 2013 Maintenance Agreement, Africare's subsequent conduct, *i.e.*, inaction in 2013 and inaction again in 2015, indicates that the promise was immaterial to Africare. In addition, Africare attributes no damages to this allegedly broken promise.

The Court concludes that these examples do not show fraudulent inducement.

### d. The CDS Statement That Five Copiers Were Necessary

Africare contends that CDS fraudulently represented that five additional Xerox copiers were necessary and suitable for the non-profit in 2015 and thus fraudulently induced Africare to agree to all five. In support, Africare highlights the April 22, 2015 email exchange between Ms. Barnes and Mr. Gross, after the 2015 Maintenance and Lease Agreements were signed but before delivery of new Xerox copiers. When Ms. Barnes questioned the need for five copiers, Mr. Gross replied that, "knowing your account the way we do," five copiers were "best" for Africare. Ex. AA, CDS Mot. Delivery was then made without another peep from Africare, including any communication from Africare that its financing and staff had decreased. And while Africare cites the testimony of Mr. Mallett, to the effect that CDS made "a series of promises" including "that [Africare] need[ed] five machines, which meant we would have seven.

That turned out not to be true," *see* Mallett Dep. at 84; this statement is inadmissible hearsay. Mr. Mallett was not with Africare in the spring of 2015 and did not participate in discussions leading to the 2015 Maintenance and 2015 Letter Agreements so he could not testify to what had been said at that time.

In any event, Africare's argument is belied by the evidence. The three agreements that Africare signed in 2015—the 2015 Maintenance Agreement, the 2015 Lease Agreement, and the 2015 Letter Agreement—were intended to replace five *existing* Toshiba copiers. While Africare contends that it was facing financial difficulties in 2015 and did not need five replacement machines, it did not make CDS aware of its financial condition. *See* Davenport Dep. at 147-48 ("[W]e weren't communicating financial condition information to any vendors . . . at that point in 2015."). CDS had no reason to know or fear the Africare reduction-in-force that substantially decreased its workforce and reduced its need for copiers. Africare's arguments are based on its private knowledge and hindsight and do not present a factual basis from which a jury might find that CDS made false representations.

The Court concludes that this example also fails to show any fraudulent inducement by CDS. Africare's claims of fraudulent inducement will be dismissed.

### 2. *Unconscionability Defense*

Africare asserts that there are numerous disputed issues of material fact related to whether the 2013 and 2015 Maintenance Agreements were procedurally and substantively unconscionable and therefore should not be enforced.

"Under D.C. law, a court can void a contract on the grounds that it is unconscionable if the party seeking to avoid the contract proves that the contract was both procedurally and substantively unconscionable." *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 97 (D.D.C. 2013). Whether an agreement "is procedurally unconscionable turns on

whether a party 'lacked meaningful choice as to whether to enter the agreement.'" *White v. Four Seasons Hotels & Resorts*, 999 F. Supp. 2d 250, 257 (D.D.C. 2013) (quoting *Fox*, 920 F. Supp. 2d at 97). The scope of choice is determined by the totality of the circumstances. "The court must ask whether 'each party to the contract, considering his obvious education or lack of it, ha[d] a reasonable opportunity to understand the terms of the contract, or [whether] the important terms [were] hidden in a maze of fine print and minimized by deceptive [] practices.'" *Fox*, 920 F. Supp. 2d at 98 (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965) (alterations in original)). "A contract is substantively unconscionable if the contract terms are unreasonably favorable to one party" such that they are "so outrageously unfair as to shock the judicial conscience." *Id.* at 99 (internal quotation marks and citation omitted). "[I]n an egregious situation," a showing of only "one or the other [form of unconscionability] may suffice." *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983) (citations and quotation marks omitted).

Africare offers a limited argument that the 2013 and 2015 Maintenance Agreements were procedurally unconscionable because CDS: (1) "pressured . . . [Africare] to sign and return the boilerplate contracts quickly, depriving Africare of the ability to understand the contract terms"; and (2) "took advantage of its superior sophistication and bargaining power in its 'negotiations' with Africare." Opp'n at 31-32. Africare further argues that "[a] reasonable jury would . . . find that the . . . CDS contracts were substantively unconscionable." *Id.* at 34.

As to the 2013 Maintenance Agreement, Africare relies on an April 30, 2013 email exchange between Mr. Gross and Ms. Brewer, in which Mr. Gross sent the 2013 Maintenance and Lease Agreements and wrote: "Thanks again for everything Katelyn. I am here the rest of the day and thank you for trying to wrap it up on month end, that means a lot."

Ex. JJ, Opp'n [Dkt. 40-5]. Africare notes that Ms. Brewer returned the agreements with Ms. Davenport's signature thirty-five minutes later and "advised that she 'look[ed] forward to going over the details tomorrow.'" *Id.* Africare asserts that "[t]hirty-five minutes is a wholly insufficient period of time to read and understand contracts of this length." Opp'n at 31-32.

Africare's argument would carry more weight but for the important facts it ignores. Mr. Gross had given a copy of the 2013 Maintenance Agreement (as well as the Lease Agreement with DLL) to Africare at the parties' in-person meeting four days earlier, on April 26, 2013. *See* Ex. Y, CDS Mot., 4/29/13 Email from Mr. Gross to Ms. Brewer (noting that Mr. Gross "left the contracts behind" at this meeting). Africare has not identified evidence that Ms. Davenport was deprived of a meaningful opportunity to review the 2013 Maintenance Agreement between April 26 and April 30, 2013, when she signed it.[20]

Africare poses a David-and-Goliath relationship between sophisticated CDS and the inexperienced Africare staff, arguing that CDS "utilized it power as a leader in the printer services industry, and the experience of Mr. Gross—who had spent more than 20 years working in printer-copier sales—to take advantage of the inexperienced Africare personnel," including Ms. Brewer, "[a] member of the fundraising team in her 20s." Opp'n at 32. According to the argument, CDS specifically "targeted Africare's fundraising personnel to get its foot in the door under the auspices of an 'outreach program,' potential 'partnership,' and CDS's purported interest in supporting Africare's mission," when "[i]n reality CDS had no interest whatsoever in Africare's mission." *Id.* at 33 (citing Morrison Dep. at 45-46; Ex. SS, Opp'n, 4/1/13 Email from Mr. Morrison to Ms. Davenport). These tactics were "marketing techniques plain and simple,

---

[20] Ms. Davenport admitted during her deposition that she reviewed the 2013 Lease and Maintenance Agreements before signing them. She also reviewed the 2015 Lease and Maintenance Agreements before signing them. Davenport Dep. at 68, 85, 150.

specifically designed to curry favor with unsuspecting non-profit fundraising staff who did not have the expertise to evaluate Africare's printing needs or contract terms." *Id.*

CDS readily admits that it used some marketing techniques in its sales effort with Africare. *See, e.g.,* Morrison Dep. at 13, 18 (noting that he included "Non-Profit Organization Specialist" in his email signature, even though non-profits' printing needs were not unique, because it was "a way in the door"). But the fact that CDS employed salesmanship to persuade Africare to enter into contracts with CDS does not support the conclusion that Africare lacked a meaningful choice on whether to agree. It is clear that when Africare signed the 2013 and 2015 Maintenance Agreements, it already had five Toshiba copiers under the long-term CIT Lease. It was also in the perennial problem of all nonprofits and may have banked on government grants which were not extended. Five new Xerox copiers proved unnecessary in 2015, as Ms. Barnes feared. *See BHM Healthcare Solutions, Inc. v. URAC, Inc.*, 320 F. Supp. 3d 1, 11 (D.D.C. 2018) (finding that procedural unconscionability requires evidence that the "services could not be obtained elsewhere").

Rather than small and untested, Africare boasts that it is "one of the most experienced and largest African-American-led non-profit international development organizations focused on Africa." Opp'n at 12. During the fiscal years when it negotiated the 2013 and 2015 Maintenance Agreements, its annual revenues approached or exceeded $50 million.[21] Not surprisingly, it had access to legal counsel during those years and could have

---

[21] According to Africare's Tax Form 990 for fiscal year 2013, Africare's total revenues were more than $60 million. *See* Tax Form 990, available at https://www.africare.org/wp-content/uploads/2014/04/FY13_Form-990_Public-Disclosure_Signed1.pdf (last visited Dec. 6, 2019). According to Africare's Tax Form 990 for fiscal year 2015, Africare's total revenues were approximately $48 million. *See* Tax Form 990, available at https://www.africare.org/wp-content/uploads/2016/06/AFRICARE-FINAL-FORM-990-PUB-DISC.pdf (last visited Dec. 6,

engaged attorneys to review them. *Cf.* Mallett Dep. at 177 (noting that "[t]here certainly were law firms available that Africare could have consulted.") Further, while Africare highlights the alleged disparity in the relative sophistication of Mr. Gross and Ms. Brewer, all agreements were signed by Ms. Davenport who "is a college-educated professional who had approximately 25 years professional experience when she negotiated the 2013 Agreements." *Id.* at 20 (citing Davenport Dep. at 14-17).

Africare has identified no evidence to suggest that it lacked a meaningful choice between the existing CIT Lease and the offers of the CDS 2013 and 2015 Maintenance Agreements. *See Fox*, 920 F. Supp. 2d at 98.

In summary, Africare has conceded, by its failure to contest the CDS motion on the point, that it breached the 2013 and 2015 Maintenance Agreements. Africare's affirmative defenses do not create identify a material issue in genuine dispute. In addition, Africare does not dispute the CDS calculation of damages. Therefore, summary judgment will be granted in favor of CDS in the amount of $10,291.73.[22]

---

2019). The Court will grant the CDS motion to take judicial notice of these Africare tax documents. *See* Def. CDS Req. for Judicial Notice [Dkt. 45]; Fed. R. Evid. 201(c).

[22] The Court need not address CDS's unjust enrichment claim, because CDS has pleaded unjust enrichment only as an alternative theory of liability. *Cf. Smith v. Rubicon Advisors, LLC*, 254 F. Supp. 3d 245, 250 (D.D.C. 2017) (noting that "a plaintiff may pursue an unjust enrichment claim as an alternative theory of liability even though the plaintiff ultimately cannot recover under both a breach of contract claim and an unjust enrichment claim pertaining to the subject matter of that contract") (internal citations omitted).

### E. CIT and Africare

*1. The Issue of Liability*

Africare seeks a declaratory judgment that it has fully performed its obligations under the CIT Lease and that CDS assumed any and all obligations that might remain. CIT counterclaims for all amounts owed under the CIT Lease, plus attorneys' fees, costs, and interest.

These two parties agree on many of the relevant facts: CIT has not breached any provision of the CIT Lease; the CIT Lease required 60 monthly payments of $3,481; Africare made direct monthly payments to CIT until June 2015; and CDS made payments to CIT on Africare's behalf between June 2015 and July 2017 but did not make a payment after July 2017. CIT then accelerated the balance it claimed was due.[23]

Citing *Sam Rayburn Dam Elec. Co-op. v. Fed. Power Comm'n*, 515 F.2d 998, 1009 n.43 (D.C. Cir. 1975), Africare argues there are genuine issues of disputed fact as to whether CIT agreed to a modification to the contract when it accepted multiple payments directly from CDS. It further emphasizes that CIT neither rejected the CDS payments nor failed to credit Africare. If, as it argues, the CIT Lease was modified, any debt is due and owed by CDS and not Africare.

CIT responds with multiple arguments of which the Court will address only the first, which resolves the issue.

The law of contractual delegation is dispositive under case law in the District of Columbia and Maryland. Under D.C. law, "'[t]he rule of delegation of responsibility is that if the obligor delegates the performance of an obligation, the obligor is not relieved of

---

[23] CIT asserts that Africare defaulted on the CIT Lease Agreement on August 7, 2017. Ex. A, CIT Mot., Aff. in Supp. of Summ. J. at 4.

responsibility for fulfilling that obligation or liability in the event of a breach.'" *Byrd v. Admiral Moving and Storage, Inc.*, 355 F. Supp. 2d 234, 236 (D.D.C. 2005) (quoting *Bashir v. Moayedi*, 627 A.2d 997, 999, 999-1000 n.6 (D.C. 1993)). Africare delegated its duty to pay all of its obligations under the CIT Lease to CDS in June 2015. However, Africare never obtained CIT's agreement and the delegation alone did not absolve Africare of liability under the CIT Lease after CDS stopped making payments to CIT. In other words, the CIT Lease never became an agreement between CIT and CDS but remained always an agreement between CIT and Africare.

The same analysis is applied by Maryland, CIT's state of choice, where it is black letter law that when a party delegates its contractual obligations to a third party, the delegating party is not absolved of legal liability in the event of a breach, unless otherwise agreed. *Pub. Serv. Comm'n of Maryland v. Panda-Brandywine, L.P.*, 825 A.2d 462, 469 (Ct. App. Md. 2003) (citing Restatement (Second) of Contracts § 318(3)). CIT further maintains that the CIT Lease expressly *forbids* delegation of contractual duties, so that conduct alone could not have modified it. *See* CIT Lease § 8. In addition, CIT asserts that it never agreed to a modification as shown by the fact that it continued to send invoices to Africare and not CDS. Africare does not dispute these underlying facts.

Summary judgment will be granted to CIT on the issue of liability.

*2. Damages*

CIT contends that Africare owes damages of $53,493.45 consisting of: (1) $7,193.00 for 2.0664 past-due (non-accelerated) monthly payments under Section 15 of the CIT Lease; (2) $20,704.46 for the remaining (accelerated) monthly payments under the CIT Lease, discounted at 3% pursuant to Section 15 of the CIT Lease; (3) $16,752.37 for the residual value of CIT's interest in the Toshiba copiers discounted at 3% pursuant to Section 15 of the CIT Lease; (4) $1,971.88 in late fees under Section 3 of the CIT Lease; and (5) $6,871.74 in 2015-

2016 property taxes under Section 12 of the CIT Lease.  CIT Mem. at 7; *see also* Ex. A, CIT Mot., Aff. in Supp. of Summ. J. [Dkt. 39-4] at 5.

CIT further contends that Africare owes:  (1) pre-judgment interest at a rate of 18% on all monies due from the date of default (August 7, 2017) under Section 15 of the CIT Lease; and (2) costs and reasonable attorneys' fees recoverable under Section 15 of the CIT Lease.

Africare decries these claims as "exorbitant" but makes no argument beyond the adjective.[24]  In its statement of disputed material facts, Africare "disputes that it owes any amounts to CIT" but does not contest CIT's calculation of damages.  *See* Africare SOF to CIT Mot. ¶¶ 18-22.  In essence, Africare disputes its liability to CIT but not the damages claimed by the latter in the event liability is found, as it has been.  *Cf.* LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

Because Africare does not contest CIT's calculation of damages, the Court will order Africare to pay damages to CIT in the amount of $53,493.45.

Africare will also be ordered to pay prejudgment interest, as required by the CIT Lease.  *See* CIT Lease §15 (stating that a defaulting party owes "interest on all monies due . . . at the rate of eighteen percent (18%) per year from the date of default until paid"); *see also* D.C. Code § 28-3302 (setting default interest rate, "in the absence of expressed contract," at 6% per

---

[24] Africare's Opposition includes a titled, "Judgment Is Inappropriate Because of Disputed Material Facts as to DLL's and CIT's Exorbitant Damages Claims."  Opp'n at 51.  However, Africare addresses only DLL's claim for damages and does not argue about the CIT claim beyond the title.

annum); *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs., LTD.*, 902 F. Supp. 2d 87, 105 (D.D.C. 2012) (upholding prejudgment interest of 18% per annum as provided by contract). The Court will award prejudgment interest to CIT at the rate of 18% per annum, from the date of default—August 7, 2017—until August 6, 2019.[25]

In addition to CIT's damages award, CIT is entitled to an award of reasonable attorneys' fees and costs, as provided by Section 15 of the CIT Lease. The attorneys' fees award will be determined in accordance with Federal Rule of Procedure 54(d)(2). *See* Fed. R. Civ. Pro. 54(d)(2).

### F. DLL's Claims Against Africare

*1. The Issue of Liability*

It is undisputed that after September 2016, Africare stopped making payments to DLL under the 2013 and 2015 Lease Agreements, for two and five Xerox copiers, respectively. DLL declared Africare in default of the 2013 and 2015 Lease Agreements on January 20, 2017. DLL contends that Africare owes $552,360.22 in damages for breaching these contracts; however, Africare asserts that it has legitimate affirmative defenses.

Africare relies on a theory of agency in asserting all affirmative defenses to enforcement of the 2013 and 2015 Lease Agreements:

> Summary judgment is . . . inappropriate on DLL's breach of contract claims for the same reasons that summary judgment is inappropriate on CDS's breach of contract claims, given the evidence that CDS fraudulently induced Africare to enter into the DLL contracts and DLL is liable for these acts as CDS's principal.

---

[25] The Court limits the accrual of interest to the date when this matter became ripe for decision, so that no party is advantaged or disadvantaged by a health-related delay in issuing a decision.

Opp'n at 49. DLL contends that Africare cannot establish a principal-agent relationship between DLL and CDS for various reasons. *See* DLL Reply at 15-23.

However, the Court has already found that CDS did not fraudulently induce Africare into the 2013 or 2015 Maintenance Agreements or the 2015 Letter Agreement. Africare offers no new facts concerning inducement in its agreements to lease Xerox copiers from DLL in 2013 and 2015 and relies on the alleged agency relationship between DLL and CDS. Such alleged agency is irrelevant because CDS did not impermissibly induce Africare to do business with it, so there is no CDS liability which might extend to DLL. Africare cannot mount a defense of fraudulent inducement to enforcement of the DLL contracts based on the legal conduct of CDS.

Africare also contends that both the 2013 and 2015 Lease Agreements are procedurally and substantively unconscionable. This contention must be resolved by the law of the Commonwealth of Pennsylvania. Under Pennsylvania law, as under D.C. law, unconscionability is found where there is "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams*, 350 F.2d at 449; *see also Rudolph v. Pennsylvania Blue Shield*, 717 A.2d 508, 512 (Pa. 1998) ("This [c]ourt has adopted the definition of unconscionability articulated by Judge Skelly Wright in *Williams*."). A party must show that the contract was both procedurally and substantively unconscionable to prove unconscionability under Pennsylvania law. *Quilloin v. Tenet Healthsystem Philadelphia, Inc.*, 673 F.3d 221, 230 (3d Cir. 2012).

Africare argues that the 2013 and 2015 Lease Agreements are procedurally unconscionable because CDS, as DLL's agent, "(1) pressured Africare to sign the contracts quickly; (2) took advantage of the gross inequality of bargaining power and sophistication

41

between the parties; and (3) failed to highlight the material risk allocation hidden in the leases." Opp'n at 30. The first two arguments have already been addressed and the Court found no procedural unconscionability in the negotiation or terms of the 2013 or 2015 Maintenance Agreements. Africare makes identical arguments concerning its 2013 and 2015 Lease Agreements with DLL but the arguments are just as infirm.

Africare adds an argument that specifically addresses the conscionability of the 2013 and 2015 Lease Agreements. It argues that "important terms regarding the interest rate, accelerated payments, and one-sided attorney fees were hidden in the 'maze of fine print' of the contracts, making the leases unconscionable." Opp'n at 33 (quoting *Williams*, 350 F.2d at 449). Africare points to the lease requirements: In the event of default, it must pay the full value of both five-year leases on an accelerated payment plan, with an 18% penalty interest rate, and if it were found in breach, Africare would be obligated to pay attorney fees, with no reciprocal obligation if DLL breached the leases. Africare emphasizes that these terms were not highlighted in the documents and there was no effort to draw them to its attention. Africare contends that "[h]iding the allocation of these costly provisions in the maze of fine print in the lease is procedurally unconscionable." Opp'n at 34.

This argument misrepresents the 2013 and 2015 Lease Agreements. The individual provisions concerning acceleration, attorney's fees, and interest rate were not hidden in a "maze of fine print," *Williams*, 350 F.2d at 449; rather, they were contained within sections of the Agreements labeled "Default" and "Remedies." *See* 2013 Lease Agreement ¶ 8 ("Default and Remedies"); 2015 Lease Agreement ¶¶ 14-15 ("Default" and "Remedies"). Each section heading was capitalized with bolded font. *See id.* While it is true that provisions within these

sections were not *themselves* bolded or emphasized, this fact does not render the contracts procedurally unconscionable.[26]

As before, the key inquiry is whether Africare had a meaningful choice to enter into the 2013 and 2015 Lease Agreements. *Williams*, 350 F.2d at 449. As discussed above, there is no doubt that Africare had a choice. Africare cannot withstand summary judgment due to its allegations of procedural unconscionability.

Africare further argues that the 2013 and 2015 Lease Agreements are substantively unconscionable. Under Pennsylvania law, "[s]ubstantive unconscionability refers to contractual terms that are unreasonably and grossly favorable to one side and to which the disfavored party does not assent." *Quilloin*, 673 F.3d at 230 (internal quotations and citations omitted). It must be noted that Africare assented to the terms it now challenges.

Africare first contends that there is evidence of "'gross overpricing'" in the Lease Agreements. Opp'n at 34 (citing *Patterson v. Walker-Thomas Furniture Co.*, 277 A.2d 111, 113 D.C. 1971) (holding that "gross overpricing may be raised in defense as an element of unconscionability"). Africare notes that "DLL's leases require payment of roughly $393,000 to use printer-copiers for five years that DLL sold for less than $5,000." *Id.* Africare contends that "such a drastic nosedive in value is evidence of a scheme to artificially inflate the price." *Id.*

_____

[26] Africare urges the Court to follow a Pennsylvania opinion that found a contract may be procedurally unconscionable if it "contains a material, risk-shifting clause which the signer would not reasonably expect to encounter in such a transaction." *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 146 (Pa. Super. Ct. 1985). However, the Pennsylvania court further noted that "[t]his type of unconscionability is typically found only in consumer cases and courts have exhibited some reluctance to apply it in cases dealing with merchant-to-merchant contracts." *Id.* Africare is, of course, a non-profit which uses its assets to assist programs in Africa. Its size and budget of $48 million in 2015, although a drop from its immediate past, was clearly bigger than many merchants, much less a private consumer. Africare fails to explain why it should be recognized as a mere consumer and not a business.

Africare has put forth no evidence that the prices in the 2013 and 2015 Lease Agreements exceeded the fair market value for long-term leases of new Xerox copiers at that time. *Patterson*, 277 A.2d at 114 ("Sufficient facts surrounding the 'commercial setting, purpose, and effect' of a contract at the time it was made should be alleged so that the court may form a judgment as to the existence of a valid claim of unconscionability."). Africare cites the resale prices of the copiers, in 2017 and 2018, years after the 2013 Lease Agreement and more than two years after 2015 Lease Agreement. But the determination of substantive unconscionability focuses on the circumstances at the time of contracting. *Williams*, 350 F.2d at 450. Africare also points to DLL's "passive and disinterested approach" during resale, including "minimal advertising and customer outreach," that allegedly contributed to the low prices obtained for the copiers. Opp'n at 19. The apparent decline in value for used copiers in 2018 could be part of the evidence but does not satisfy *Patterson* without contemporaneous facts at the time of leasing in 2013 and 2015.

Africare further asserts that "there is additional evidence suggesting collusion and price-setting between CDS and DLL." *Id.* at 34. Africare says that DLL approved Africare in 2015 to pay $221,634.62, the same amount of financing that CDS requested. *Id.* at 35. It also cites a May 18, 2015 email from a DLL employee asking CDS "for its 'Xerox worksheets with the MSRP [Manufacturer Suggested Retail Price] on this deal,'' because "[DLL's] equipment guys [were] not coming up with enough MSRP" to support the lease when they did their own valuation. *Id.* (citing Ex. VV, Opp'n [Dkt. 40-5]). Africare contends that "[t]his evidence suggests that CDS inflated the price of the printer-copiers leased to Africare in 2015, and DLL relied on CDS for these figures." *Id.*

Africare's conclusory allegations of overpricing and collusion are not sufficient to withstand summary judgment. *Greene*, 164 F.3d at 675. At best, the email that Africare

references shows that CDS and DLL corresponded about the retail value of the copiers in May 2015 and that employees from the two companies calculated a different retail price at that time. This minimal evidence does not create a triable issue of fact that CDS "inflated" the value of the copiers or that the retail price that CDS calculated was otherwise incorrect. Africare provides no evidence that CDS's valuation resulted in a contract that was "grossly favorable" to DLL. *Quilloin*, 673 F.3d at 230.

Finally, Africare argues that "the cumulative effect of the provisions reallocating the risk of breach—high interest rates, accelerated payments, and attorney's fee provisions—is substantively unconscionable." Opp'n at 35. It argues that "[t]hese provisions so extremely reallocate the risk of default on Africare that the court should not enforce them." *Id.* (citing *Germantown Mfg. Co.*, 491 A.2d at 146 (stating that "[i]f the terms of the contract suggest a reallocation of material risks, an attempted reallocation may be so extreme that regardless of apparent and genuine assent, a court will not enforce it")).

The risk-shifting provisions in the Lease Agreements do not render the contracts substantively unconscionable.[27] To the contrary, contractual provisions for accelerated payments and pre-judgment interest are routinely enforced. *See Leaman v. Wolfe*, No. 2:13-cv-00975, 2017 WL 528280, at *5 (E.D. Pa. Feb. 9, 2017) (noting that "[a]cceleration clauses are valid and enforceable under Pennsylvania law"); *see also Amerisourcebergen Drug Corp. v. Meier*, No. 03-cv-6769, 2005 WL 1213913, at *5 (E.D. Pa. May 19, 2005) (finding that parties agreed to 18% prejudgment interest rate and awarding plaintiff such interest). In addition, fee shifting provisions are enforceable in Pennsylvania so long as there is "clear agreement by the parties."

---

[27] The only case cited by Africare dealt with a contractual confession of judgment clause, which the court declared was designed to "summarily discard . . . due process guarantees" by "dispens[ing] with the signer's day in court." *Germantown Mfg. Co.*, 491 A.2d at 146.

*Chatham Communications, Inc. v. General Press Corp.*, 344 A.2d 837, 842 (Pa. 1975). Africare has not cited—nor has the Court identified—any Pennsylvania case holding that attorney fee provisions must be reciprocal. *Cf.* Jeffrey C. Bright, *Unilateral Attorney's Fees Clauses: A Proposal to Shift the Golden Rule*, 61 Drake L. Rev. 85, 109, 119 (2012) (noting that unilateral attorney's fees clauses are "widespread" and identifying Pennsylvania as one of thirty-one states that has not enacted any statutes protecting against such clauses).

The Court concludes that Africare has not shown sufficient evidence to support its defenses. Summary judgment will be granted in favor of DLL on the issue of liability.[28]

 *2. Damages*

DLL asserts that Africare owes damages of $69,801.96 under the 2013 Lease Agreement, consisting of: (1) $7,823 in past due payments; (2) $95.96 for an unpaid finance charge; (3) $293.70 in late fees; (4) $1,479.44 in property tax and administrative fees; (5) $39,492.68 for the remaining monthly payments accelerated under the agreement, discounted at 3%; (6) $20,617.18 in interest; and (7) reasonable attorneys' fees and expenses. DLL Mem. at 18.[29]

DLL asserts that it has incurred $484,381.96 in damages under the 2015 Lease Agreement, consisting of: (1) $24,375.40 for past due payments; (2) $1,288.90 in late fees; (3) $435.45 for insurance charges; (4) $6,263.97 in property tax and administrative fees; (5)

---

[28] Summary judgment will also be granted to DLL on Africare's Counterclaim for which Africare has not made any arguments. The Court will treat the arguments that Africare failed to address as conceded. *See Hopkins*, 284 F. Supp. 2d at 25.

[29] DLL notes that its "attorneys' fees were incurred as a result of pursuing the enforcement of, and collection under, both the 2013 and 2015 Lease Agreements simultaneously. Accordingly, . . . the attorneys' fees incurred as a result of Africare's collective breaches are included in the section . . . addressing the 2015 Lease Agreement." *Id.* at 18 n.3.

$208,072.46 for the remaining payments accelerated under the agreement, discounted at 3%; (6) $100,785.58 in interest as of May 20, 2019, the date DLL moved for summary judgment; and (7) $143,160.20 in reasonable attorneys' fees and expenses.[30]

Africare argues that summary judgment is not appropriate due to an alleged failure by DLL to mitigate damages. "[A] plaintiff's duty to mitigate its damages arises upon the defendant's breach of the contract." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996). To "prove a failure to mitigate, a defendant must establish: (1) reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced." *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F. Supp. 735, 749 (E.D. Pa. 1998) (quotation marks omitted).

Africare notes that "[b]y November 2016, Africare had informed CDS that it was not utilizing all of the printer-copiers" and Africare was actively attempting to renegotiate the CDS and DLL contracts; in addition, Africare had missed a DLL payment by November 2016. Opp'n at 52-53. Africare points out that DLL did not repossess the copiers until July 2017, and the last copier was not sold until March 2018. *Id.* at 53. Africare argues that during the time between November 2016 and July 2017, "the printer-copiers decreased in value . . . [and] [h]ad DLL or CDS agreed to pick up the printer-copiers and sold them more quickly, which would have been reasonable under the circumstances, the amount that DLL set off against Africare's claim would be higher." *Id.*

DLL asserts that Africare's defense fails as a matter of law because "Africare cites to no record evidence to support its theory that the printer-copiers decreased in value, or

---

[30] DLL states that it has reduced its total damages by $1,823.70, the amount obtained from the copiers' sale. DLL Mem. at 19 n.4.

that had the used printer-copiers been sold any earlier they would have been sold for a materially

higher price." DLL Reply at 24. DLL contends that since "the record is devoid of any evidence

of the 'amount by which the damages would have been reduced,'" *Aircraft Guar. Corp.*, 991 F.

Supp. at 749, Africare cannot mount this affirmative defense under Pennsylvania law. DLL

Reply at 24.

The Court agrees. Africare has provided no documentation to support its

assertion that the copiers decreased in value between November 2016 and the time they were

sold. Without any evidence to support its argument, Africare cannot create a genuine issue of

material fact preventing the entry of summary judgment on damages.

Africare does not dispute that the 2013 and 2015 Lease Agreements require, upon

default, payment of past due payments and accelerated payments discounted at a rate of 3%.

Africare also does not dispute that the 2013 and 2015 Lease Agreements provide for the recovery

of late fees, finance charges, insurance charges, property tax, and administrative fees. Africare

has not contested DLL's calculation of damages.

The Court finds that Africare owes DLL $287,797.26 in damages, consisting of

$49,184.78 under the 2013 Lease Agreement[31] and $240,436.18 under the 2015 Lease

Agreement,[32] less $1,823.70 from DLL's recovery of the sale of equipment.

Africare will be required to pay prejudgment interest. The 2013 Lease Agreement

and 2015 Lease Agreement both state that the defaulting party owes 18% interest on the unpaid

---

[31] This amount consists of $7,823 in past due payments; $95.96 for an unpaid finance charge; $293.70 in late fees; $1,479.44 in property tax and administrative fees; and $39,492.68 for the remaining monthly payments accelerated under the agreement, discounted at 3%.

[32] This amount consists of $24,375.40 in past due payments; $1,288.90 in late fees; $435.45 in insurance charges; $6,263.97 in property tax and administrative fees; and $208,072.46 for the remaining payments accelerated under the agreement, discounted at 3%.

balance.  *See* 2013 Lease Agreement ¶ 8; 2015 Lease Agreement ¶¶ 14-15.  Because the interest rate of 18% is provided in the contract, DLL is entitled to that amount under Pennsylvania law.  *See Meier*, 2005 WL 1213913, at *5.  The Court will award prejudgment interest to CIT at the rate of 18% per annum, from the date of default— January 20, 2017—until August 6, 2019.[33]

 In addition to DLL's damages award, DLL is entitled to an award of reasonable attorneys' fees and costs, as provided in the 2013 and 2015 Lease Agreements.  The attorneys' fees award will be determined in accordance with Federal Rule of Procedure 54(d)(2).  *See* Fed. R. Civ. Pro. 54(d)(2).

## IV.  CONCLUSION

 For the reasons stated, CDS's Motion for Summary Judgment, Case No. 17-cv-1712, Dkt. 35, will be granted; CIT's Motion for Summary Judgment, Case No. 17-cv-1712, Dkt. 39, will be granted; and DLL's Motion for Summary Judgment, Case No. 17-cv-1945, Dkt. 47, will be granted.  The Africare counterclaim against DLL will be denied.  A separate Order accompanies this Memorandum Opinion.


Date: January 17, 2020       _____

          ROSEMARY M. COLLYER
          United States Senior District Judge

---

[33] The Court limits the accrual of interest to the date when this matter became ripe for decision, so that no party is advantaged or disadvantaged by a health-related delay in issuing a decision.